# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| SIERRA CLUB, NATURAL RESOURCES DEFENSE COUNCIL, MICHIGAN ENVIRONMENTAL COUNCIL, ENVIRONMENTAL DEFENSE FUND, ENVIRONMENTAL LAW AND POLICY CENTER, VOTE SOLAR, UNION OF CONCERNED SCIENTISTS, ECOLOGY CENTER, and URBAN CORE COLLECTIVE, | ) ) ) ) ) ) ) ) ) ) | |
| Petitioners | ) ) | Case No. 25-1160 |
| v. | ) ) | |
| U.S. DEPARTMENT OF ENERGY, and CHRIS WRIGHT, in his official capacity as Secretary of Energy, | ) ) ) ) | |
| Respondents. | ) ) | |

## PETITION FOR REVIEW

Sierra Club, Natural Resources Defense Council, Michigan Environmental Council, Environmental Defense Fund, Environmental Law and Policy Center, Vote Solar, Union of Concerned Scientists, Ecology Center, and Urban Core Collective (collectively, "Public Interest Organizations") petition the Court for review of the Department of Energy's and Secretary of Energy Christopher Wright's (collectively, "DOE") Order No. 202-25-3 dated May 23, 2025 (the "Order") (Exhibit A), DOE's denial by inaction of Public Interest Organizations' request for rehearing of the

1

Order, and any amendment, modification, or renewal of that Order. Public Interest Organizations petition under section 313 of the Federal Power Act, 16 U.S.C. § 825*l*(b), and section 502 of the DOE Organization Act of 1977, 42 U.S.C. § 7192(a), along with Federal Rule of Appellate Procedure 15(a) and D.C. Circuit Rule 15(a). On June 18, 2025, Public Interest Organizations timely moved to intervene and sought rehearing of the Order (Exhibit B).

The prerequisites for judicial review of this petition have been met. DOE has not acted within 30 days upon Public Interest Organizations' request for rehearing. *See* DOE, *Federal Power Act Section 202(c) Midcontinent Independent System Operator (MISO)* (last visited July 24, 2025), https://www.energy.gov/ceser/federal-power-act-section-202c-midcontinent-independent-system-operator-miso  (linking to the Order and associated requests for rehearing submitted to DOE). Public Interest Organizations' request for rehearing is therefore deemed denied. 16 U.S.C. § 825*l*(a). Public Interest Organizations' petition is filed within sixty days after the denial of rehearing. *Id.* § 825*l*(b). This Court has subject matter jurisdiction, Public Interest Organizations are parties aggrieved by the Order, and venue is proper. *Id.* § 825*l*(a)–(b).

Dated: July 24, 2025

[continued for signatures]

2

Respectfully Submitted,

*/s/ Benjamin Chagnon*[1]
Benjamin Chagnon (DC Cir. 65850)
Michael Lenoff
Michael Soules (DC Cir. 60570)
1001 G St. NW, Suite 1000
Washington, DC 20001
(202) 745-5210
bchagnon@earthjustice.org
mlenoff@earthjustice.org
msoules@earthjustice.org

Shannon Fisk
48 Wall St., 15th Floor
New York, NY 10005
(215) 717-4522
sfisk@earthjustice.org

Lauren Piette
Sameer Doshi (DC Cir. 64549)
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
(312) 500-2193
lpiette@earthjustice.org
sdoshi@earthjustice.org

Christine Powell (DC Cir. 64908)
Ada Statler (DC Cir. 65969)
180 Steuart St., #194330
San Francisco, CA 94105
(415) 217-2035
cpowell@earthjustice.org
astatler@earthjustice.org

*Counsel for Sierra Club and Urban Core
Collective*

---

[1] Counsel represents that the other parties listed in the signature blocks on this document consent to this filing.

3

*/s/ Gregory E. Wannier*
Gregory E. Wannier (DC Cir. 55920)
Sanjay Narayan (DC Cir. 48545)
Elena Saxonhouse (DC Cir. 56639)
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
elena.saxonhouse@sierraclub.org

*Counsel for Sierra Club*

*/s/ Caroline Reiser*
Caroline Reiser (DC Cir. 62319)
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington DC, 20005
(202) 717-8341
creiser@nrdc.org

Gavin McCabe (DC Cir. 53966)
Natural Resources Defense Council
40 W. 20th St., 11th Floor
New York, NY 10011
(212) 727-4529
gmccabe@nrdc.org

Simi Bhat
Karen Chen
Natural Resources Defense Council
111 Sutter St., 21st floor
San Francisco, CA 94104
(415) 875-6110
sbhat@nrdc.org

*Counsel for Natural Resources Defense Council*

4

*/s/ Danielle C. Fidler*
Danielle C. Fidler (DC Cir. 62486)
Francis W. Sturges, Jr. (DC Cir. 64964)
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
(617) 624-0234
dfidler@catf.us
fsturges@catf.us

*Counsel for Michigan Environmental Council*

*/s/ Howard A. Learner*
Howard A. Learner (DC Cir. 61779)
Bradley Klein
Environmental Law & Policy Center
35 East Wacker Dr., Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
HLearner@elpc.org
BKlein@elpc.org

Katherine S. Duckworth
Environmental Law & Policy Center
1008 Floral Ave. SE
East Grand Rapids, MI 49506
T: (312) 673-6500
KDuckworth@elpc.org

*Counsel for the Environmental Law & Policy Center, Ecology Center, Union of Concerned Scientists, and Vote Solar*

*/s/ Tomás Carbonell*
Tomás Carbonell (DC Cir 54320)
Ted Kelly
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
(919) 449-4600
tcarbonell@edf.org
tekelly@edf.org

*Counsel for Environmental Defense Fund*

## RULE 26.1 DISCLOSURE STATEMENTS

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Petitioners make the following disclosures:

Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment. Sierra Club has no parent companies and no publicly held company has a 10% or greater ownership interest in Sierra Club.

Natural Resources Defense Council states that it is a non-profit environmental organization. NRDC has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Michigan Environmental Council is a non-profit organization with no parent corporation and no outstanding stock shares or other securities in the hands of the public. Michigan Environmental Council does not have any parent, subsidiary, or affiliate that has issued stock shares or other securities to the public. No publicly held corporation owns any stock in Michigan Environmental Council.

Environmental Defense Fund states that it is a 501(c)(3) non-profit environmental organization dedicated to finding practical solutions to critical environmental problems through the use of law, policy, science, and economics. Environmental Defense Fund has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Environmental Law & Policy Center states that it is a non-profit environmental organization. Petitioner Environmental Law & Policy Center does not have any parent corporation and no publicly held corporation owns 10% or more of its stock.

Vote Solar states that it is a non-profit environmental organization. Petitioner Vote Solar does not have any parent corporation and no publicly held corporation owns 10% or more of its stock.

Union of Concerned Scientists states that it is a non-profit environmental organization. Petitioner Union of Concerned Scientists does not have any parent corporation and no publicly held corporation owns 10% or more of its stock.

Ecology Center states that it is a non-profit environmental organization. Petitioner Ecology Center does not have any parent corporation and no publicly held corporation owns 10% or more of its stock.

Urban Core Collective is a non-profit organization. Urban Core Collective does not have any parent corporation and no publicly held corporation owns 10% or more of its stock.

[continued for signatures]

*/s/ Benjamin Chagnon*[1]
Benjamin Chagnon (DC Cir. 65850)
1001 G St. NW, Suite 1000
Washington, DC 20001
(202) 745-5210
bchagnon@earthjustice.org

*Counsel for Sierra Club and Urban Core Collective*

*/s/ Gregory E. Wannier*
Gregory E. Wannier (DC Cir. 55920)
Sanjay Narayan (DC Cir. 48545)
Elena Saxonhouse (DC Cir. 56639)
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
elena.saxonhouse@sierraclub.org

*Counsel for Sierra Club*

*/s/ Caroline Reiser*
Caroline Reiser (DC Cir. 62319)
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington DC, 20005
(202) 717-8341
creiser@nrdc.org

---

[1] Counsel represents that the other parties listed in the signature blocks on this document consent to this filing.

Gavin McCabe (DC Cir. 53966)
Natural Resources Defense Council
40 W. 20th St., 11th Floor
New York, NY 10011
(212) 727-4529
gmccabe@nrdc.org

Simi Bhat
Karen Chen
Natural Resources Defense Council
111 Sutter St., 21st floor
San Francisco, CA 94104
(415) 875-6110
sbhat@nrdc.org

*Counsel for Natural Resources Defense Council*

*/s/ Danielle C. Fidler*
Danielle C. Fidler (DC Cir. 62486)
Francis W. Sturges, Jr. (DC Cir. 64964)
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
(617) 624-0234
dfidler@catf.us
fsturges@catf.us

*Counsel for Michigan Environmental Council*

*/s/ Howard A. Learner*
Howard A. Learner (DC Cir. 61779)
Bradley Klein
Environmental Law & Policy Center
35 East Wacker Dr., Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
HLearner@elpc.org
BKlein@elpc.org

Katherine S. Duckworth
Environmental Law & Policy Center
1008 Floral Ave. SE
East Grand Rapids, MI 49506
T: (312) 673-6500
KDuckworth@elpc.org

*Counsel for the Environmental Law &
Policy Center, Ecology Center, Union of
Concerned Scientists, and Vote Solar*

*/s/ Tomás Carbonell*
Tomás Carbonell (DC Cir 54320)
Ted Kelly
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
(919) 449-4600
tcarbonell@edf.org
tekelly@edf.org

*Counsel for Environmental Defense Fund*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing **Petition for Review** and **Rule 26.1 Disclosure Statements** and all attachments with the Clerk of the Court using the Court's CM/ECF system.

I further certify that I have on this 24th day of July, 2025, caused copies of the foregoing to be served via certified priority mail, return receipt requested, upon the Department of Energy and Secretary Chris Wright at:

> U.S. Department of Energy
> 1000 Independence Ave., SW
> Washington, DC 20585

I also caused copies to be sent via electronic mail to AskCR@hq.doe.gov and The.Secretary@hq.doe.gov.

I have also served a copy of the foregoing on all parties to the proceeding before the DOE via first-class certified mail and via electronic mail.

Dana Nessel,
  Michigan Attorney General
Michael E. Moody
  Assistant Attorney General
Special Litigation Division
525 W. Ottawa St.
P.O. Box 30755
Lansing, MI 48909
MoodyM2@michigan.gov

Keith Ellison,
  Attorney General of Minnesota
Peter Surdo
  Special Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota St., Suite 600
St. Paul, MN 55101
Peter.Surdo@ag.state.mn.us

Christopher M. Bzdok
  Special Assistant Attorney General
420 E. Front St.
Traverse City, MI 49686
chris@tropospherelegal.com

Debra D. Roby
  Partner
Washington Energy Law LLP
900 17th St. NW, Suite 500-A
Washington, DC 20006
droby@washingtonenergylaw.com


William F. Fields
  Deputy People's Counsel
Maryland Office of People's
Counsel
6 St. Paul St., Suite 2102
Baltimore, MD 21202
William.fields@maryland.gov


Kelly M. Hall
  Deputy General Counsel and Vice
President, Rates and Regulatory
Consumers Energy Co.
One Energy Plaza
Jackson, MI 49201
Kelly.Hall@cmsenergy.com

Kwame Raoul,
  Attorney General of the State of Illinois
Samuel C. Lukens,
  Assistant Attorney General
Office of the Illinois Attorney General
115 South LaSalle St., 25th Floor
Chicago, IL 60603
Samuel.Lukens@ilag.gov


Brad Pope
  Legal and Regulatory Director
Organization of MISO States
811 E. Washington Ave., Suite 400
Madison, WI 53703
brad@misostates.org


Timothy R. Caister
  Vice President, Legal & Federal
Regulatory Affairs
Midcontinent Independent System
Operator, Inc.
720 City Center Drive
Carmel, IN  46032-3826
tcaister@misoenergy.org

Dated: July 24, 2025

Respectfully submitted,

/s/ Benjamin Chagnon
Benjamin Chagnon

# Exhibit A

## Order No. 202-25-3

Pursuant to the authority vested in the Secretary of Energy by section 202(c) of the Federal Power Act (FPA), 16 U.S.C. § 824a(c), and section 301(b) of the Department of Energy Organization Act, 42 U.S.C. § 7151(b), and for the reasons set forth below, I hereby determine that an emergency exists in portions of the Midwest region of the United States due to a shortage of electric energy, a shortage of facilities for the generation of electric energy, and other causes, and that issuance of this Order will meet the emergency and serve the public interest.

*Emergency Situation*

The Midcontinent Independent System Operator (MISO) faces potential tight reserve margins during the summer 2025 period, particularly during periods of high demand or low generation resource output. The North American Electric Reliability Corporation (NERC) released its 2025 Summer Reliability Assessment on May 14, 2025. In its assessment, NERC indicated that "[d]emand forecasts and resource data indicate that MISO is at elevated risk of operating reserve shortfalls during periods of high demand or low resource output."[1] In particular, the retirement of thermal generation capacity creates the potential for electricity supply shortfalls. NERC anticipates that the near-term period of highest capacity shortfall for MISO will occur in August.[2]

Multiple generation facilities in Michigan have retired in recent years. According to the U.S. Energy Information Administration (EIA), "[s]ince 2020, about 2,700 megawatts of coal-fired generating capacity have been retired and no new coal-fired facilities are planned."[3] Additionally EIA stated, "[t]ypically Michigan's nuclear power plants have supplied about 30% of in-state electricity, but the amount of electricity generated by nuclear power plants in Michigan has declined as plants have been decommissioned."[4] The state's Big Rock Point nuclear power plant shut down in 1997 and the Palisades nuclear power plant closed in 2022. While the Palisades nuclear power plant may reopen in 2025, it will not be available during the peak demand period this summer.

The 1,560 MW J.H. Campbell coal-fired power plant in West Olive, MI, is scheduled to cease operations on May 31, 2025. Its retirement would further decrease available dispatchable generation within MISO's service territory, removing additional such generation along with the other 1,575 MW of natural gas and coal-fired generation that has retired since the summer of 2024. In 2021, Consumers announced that it planned to "speed closure" of Campbell in 2025, several years before the end of its scheduled design life.[5] Although MISO and Consumers have

---

[1] 2025 summer reliability assessment. (May 14, 2025).
https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2025.pdf
[2] *Id*.
[3] U.S. Energy Information Administration, Michigan State Energy Profile, Oct. 17, 2024, *available at*:
https://www.eia.gov/state/print.php?sid=mi.
[4] *Id.*
[5] https://www.consumersenergy.com/news-releases/news-release-details/2021/06/23/consumers-energy-announces-plan-to-end-coal-use-by-2025-lead-michigans-clean-energy-transformation

incorporated the planned retirement into their supply forecasts and acquired a 1,200 MW natural gas power plant in Covert, MI, the NERC Assessment still anticipates "elevated risk of operating reserve shortfalls."

MISO's Planning Resource Auction Results for Planning Year 2025-26, released in April 2025, note that for the northern and central zones, which includes Michigan, "new capacity additions were insufficient to offset the negative impacts of decreased accreditation, suspensions/retirements and external resources." While the results "demonstrated sufficient capacity," the summer months reflected the "highest risk and a tighter supply-demand balance" and the results "reinforce the need to increase capacity."[6]

*ORDER*

Given the determination that an emergency exists as discussed above, the responsibility of MISO to ensure reliability of its system, and the ability of MISO to identify and dispatch generation necessary to meet load requirements, I have determined that, under the conditions specified below, additional dispatch of the Campbell Plant is necessary to best meet the emergency and serve the public interest for purposes of FPA section 202(c). This determination is based on the insufficiency of dispatchable capacity and anticipated demand during the summer months, and the potential loss of power to homes and local businesses in the areas that may be affected by curtailments or outages, presenting a risk to public health and safety.

This Order is limited in duration to align with the emergency circumstances. Because the additional generation may result in a conflict with environmental standards and requirements, I am authorizing only the necessary additional generation on the conditions contained in this Order, with reporting requirements as described below.

FPA section 202(c) requires the Secretary of Energy to ensure that any 202(c) order that may result in a conflict with a requirement of any environmental law be limited to the "hours necessary to meet the emergency and serve the public interest, and, to the maximum extent practicable," be consistent with any applicable environmental law and minimize any adverse environmental impacts.

Based on my determination of an emergency set forth above, I hereby order:

A. From the time this Order is issued on May 23, 2025, MISO and Consumers Energy shall take all measures necessary to ensure that the Campbell Plant is available to operate. For the duration of this order, MISO is directed to take every step to employ economic dispatch of the Campbell Plant to minimize cost to ratepayers. Following conclusion of this Order, sufficient time for orderly ramp down is permitted, consistent with industry practices. Consumers Energy is directed to comply with all orders from MISO related to the availability and dispatch of the Campbell Plant.

---

[6] https://cdn.misoenergy.org/2025%20PRA%20Results%20Posting%2020250428694160.pdf

B.  To minimize adverse environmental impacts, this Order limits operation of dispatched units through the expiration of the Order. MISO shall provide a daily notification to the Department (via AskCR@hq.doe.gov) reporting whether the Campbell Plant has operated in compliance with the allowances contained in this Order.

C.  All operation of the Campbell Plant must comply with applicable environmental requirements, including but not limited to monitoring, reporting, and recordkeeping requirements, to the maximum extent feasible while operating consistent with the emergency conditions. This Order does not provide relief from any obligation to pay fees or purchase offsets or allowances for emissions that occur during the emergency condition or to use other geographic or temporal flexibilities available to generators.

D.  By June 15, 2025, MISO is directed to provide the Department of Energy (via AskCR@hq.doe.gov) with information concerning the measures it has taken and is planning to take to ensure the operational availability and economic dispatch of the Campbell Plant consistent with the public interest. MISO shall also provide such additional information regarding the environmental impacts of this Order and its compliance with the conditions of this Order, in each case as requested by the Department of Energy from time to time.

E.  The extent to which MISO's current Tariff provisions are inapposite to effectuate the dispatch and operation of the units for the reasons specified herein, the relevant governmental authorities are directed to take such action and make accommodations as may be necessary to do so.

F.  Consumers is directed to file with the Federal Energy Regulatory Commission Tariff revisions or waivers necessary to effectuate this order. Rate recovery is available pursuant to 16 U.S.C. § 824a(c).

G.  This Order shall not preclude the need for the Campbell Plant to comply with applicable state, local, or Federal law or regulations following the expiration of this Order.

H.  This Order shall be effective upon its issuance, and shall expire at 00:00 EDT on August 21, 2025, with the exception of the reporting requirements in paragraph D and applicable compliance obligations in paragraph E.

I.  Issued in Washington, D.C. at 3:15:pm Eastern Daylight Time on this 23rd day of May 2025.

Chris Wright
Secretary of Energy

cc: **<u>FERC Commissioners</u>**
    Chairman Mark Christie
    Commissioner David Rosner
    Commissioner Lindsay S. See
    Commissioner Judy W. Chang

    **<u>Michigan Public Service Commissioners</u>**
    Chairman Dan Cripps
    Commissioner Katherine Peretick
    Commissioner Alessandra Carreon

# Exhibit B

BEFORE THE UNITED STATES DEPARTMENT OF ENERGY

|  |  |  |
|---|---|---|
| Federal Power Act Section 202(c) Emergency Order: Midcontinent Independent System Operator (MISO) | ) ) ) ) ) | Order No. 202-25-3 |

Motion to Intervene and Request for Rehearing and Stay of
Sierra Club, Natural Resources Defense Council, Michigan Environmental
Council, Environmental Defense Fund, Environmental Law and Policy Center,
Vote Solar, Public Citizen, Union of Concerned Scientists, the Ecology Center
and Urban Core Collective (collectively, "Public Interest Organizations")

**INTRODUCTION** ............................................................................................. 3

**I. STATEMENT OF ISSUES AND SPECIFICATION OF ERROR** ..................... 4

**II. INTERVENORS' INTERESTS** ................................................................... 5

**III. BACKGROUND** ....................................................................................... 11

    *A. The Campbell Plant Does Not Benefit Consumers Energy's Customers.* ......... 11

        1. Campbell Is Old, Unreliable, Dirty, and Expensive .................................. 11

        2. Consumers Energy Is a Utility in MISO. ................................................... 14

    *B. Multiple Authorities Already Protect Resource Adequacy.* ............................ 14

        1. MISO Protects Resource Adequacy Through Reserve Margin Requirements and a Residual Capacity Auction. ..................................... 14

        2. Michigan Protects Resource Adequacy Through Integrated Resource Planning and Annual Capacity Demonstration Requirements. ................ 18

        3. NERC Protects Resource Adequacy Through Standards and Regular Assessments. ............................................................................................. 19

    *C. Campbell's May 31, 2025 Retirement and Resource Adequacy in Summer 2025 Have Been Carefully Planned.* ............................................................... 19

        1. Campbell's May 31, 2025 Retirement Was the Product of Careful Planning from Diverse Stakeholders Under a Settlement that Improves Resource Adequacy. ...................................................................................... 19

        2. MISO Approved Campbell's May 31, 2025 Retirement Upon Finding No Reliability Violations. ................................................................................ 21

        3. Consumers Has Been Winding Down Campbell and Ramping Up Replacement Resources. .......................................................................... 22

        4. Consumers Has Continued to Demonstrate Resource Adequacy. ............ 24

5. MISO Has More Resources than It Needs to Ensure Resource Adequacy in Summer 2025. .................................................................................. 24

6. FERC's Recent Technical Conference Confirms that MISO Has Adequate Resources for Summer 2025. ....................................................... 25

**IV. REQUEST FOR REHEARING** ................................................................ 26

A. *The Order Exceeds the Department's Authority Because the Department Has Not Demonstrated, and Cannot Demonstrate, an Emergency Necessitating Continued Operation of the Campbell Plant.* .................................................... 26

1. Section 202(c) Only Authorizes the Department to Respond to Specific, Imminent, and Temporary Events Necessitating Immediate Response... 26

2. There Is No Factual Basis Supporting the Department's Order. .............. 29

B. *Even if There Were a Short-Term Need—Which There is Not—the Order Does Not Comply with the Statutory Command to Set Terms that Best Meet the Emergency and Serve the Public Interest.* ........................................................ 36

1. Section 202(c)(1) Only Authorizes the Department to Require Generation that Best Meets the Emergency and Serves the Public Interest............... 36

2. The Order Fails to Impose Requirements that Best Meet the Claimed Emergency and Serve the Public Interest. ................................................. 37

3. The Order Is Unlawfully Ambiguous, Impermissibly Vague, and Does Not Provide Fair Notice of What MISO, Consumers Energy, and Others Are Required to Do. ........................................................................................ 42

C. *The Order's Availability Requirements Exceed the Department's Statutory Authority.* ....................................................................................................... 43

D. *The Order Fails to Provide the Conditions Necessary to Override Environmental Standards Under Section 202(c)(2).* ....................................... 46

1. The Order Lacks the Conditions Required by Section 202(c)(2)............... 46

2. The Campbell Plant's Pollution and Lack of Maintenance Mean that the Absence of Effective Environmental Conditions Will Have Especially Severe Effects. ......................................................................................... 48

E. *The Order and the Department's Continued Conduct Are Inconsistent with Departmental Procedure, Depriving the Public and the Public Interest Organizations of Fair Notice and an Adequate Record.* ................................. 50

**V. REQUEST FOR STAY** ......................................................................... 51

**VI. CONCLUSION** ................................................................................... 54

INTRODUCTION

On May 23, 2025, the Secretary of Energy, on behalf of the Department of Energy (collectively the "Department" or "DOE"), issued an order pursuant to Section 202(c) of the Federal Power Act, 16 U.S.C. § 824a(c) ("Section 202(c)") instructing the Midcontinent Independent System Operator ("MISO") and Consumers Energy Company ("Consumers" or "Consumers Energy") to "take all measures necessary to ensure that" the J.H. Campbell coal-fired power plant, in West Olive, Michigan (the "Campbell Plant," or "Campbell") "is available to operate" and directing MISO "to take every step to employ economic dispatch of the Campbell Plant to minimize cost to ratepayers," until August 21, 2025. Ex. 1 at 2 (DOE Campbell Order) (the "Order"). Prior to the issuance of the Order, Consumers Energy was preparing to retire the Campbell Plant on May 31, 2025, with the approval of the Michigan Public Service Commission ("Michigan Commission") and MISO.

The Department should grant rehearing and rescind this costly, harmful, unnecessary, and unlawful order. The Order was not requested by Consumers, MISO, or the Michigan Commission. On the contrary, all of those entities—who collectively bear primary responsibility over Michigan's electric system—have confirmed that retiring the Campbell Plant is economically and environmentally beneficial, and poses no significant risk to the reliability of the electric system in Michigan or elsewhere. The Order is based on a profoundly incorrect understanding of the handful of sources it selectively quotes. Those sources, and the Order itself, do not support the Order's claim of a resource adequacy emergency in any of the various locations at which the Order ambiguously gestures. In fact, each of those areas have more resources than are projected as needed to meet demand.

The Order also fails to grapple with the Campbell Plant's inability to reliably operate even in normal circumstances, let alone an emergency. Because the Campbell Plant is at the end of its useful life and Consumers has substantially reduced capital and major maintenance investments over the past few years in anticipation of retirement, the plant would require tremendous maintenance and investment to function consistently. The Department has no authority to compel Consumers to rehabilitate (and effectively reconstruct) the increasingly unreliable plant, nor to override the state's and utility's decision to replace the plant with less expensive and cleaner sources. The Order is thus beyond the Department's authority.

On top of all these failures, the Order makes no effort to limit the significant environmental and public health harms caused by burning coal at the plant, despite explicit instruction from Congress to do so. Campbell harms its neighbors—the same Michiganders that decided to close the plant. The Department has, moreover, thus far done all this behind closed doors, without making public the information

3

demanded of MISO and Consumers, despite Departmental procedure requiring transparency.

At its heart, the Order represents an effort to replace the market- and state-led planning process provided by statute with an ill-advised and misinformed exercise in federal command-and-control. That effort disserves the public and violates the law. The Order must be rescinded.

## I. STATEMENT OF ISSUES AND SPECIFICATION OF ERROR

The undersigned Public Interest Organizations move to intervene and request rehearing and a stay pursuant to section 313(a) of the Federal Power Act, 16 U.S.C. § 825*l*(a), and the applicable rules of practice and procedure, U.S. Dep't of Energy, *DOE 202(c) Order Rehearing Procedures* (last visited June 18, 2025), https://www.energy.gov/ceser/doe-202c-order-rehearing-procedures (attached as Ex. 30) [hereinafter "DOE Rehearing Procedures"]; 18 C.F.R. §§ 385.214, 385.713,[1] based upon the following errors and issues:

A.  The Department has not demonstrated that an emergency exists that authorizes it to issue the Order. 16 U.S.C. §§ 824a(a)–(c), 824o; 10 C.F.R. § 205.371–.375; *Emergency Interconnection of Elec. Facilities and the Transfer of Elec. to Alleviate an Emergency Shortage of Elec. Power,* 46 Fed. Reg. 39,984 (Aug. 6, 1981); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000); *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303 (1961); *Citizens Action Coal. v. FERC*, 125 F.4th 229 (D.C. Cir. 2025); *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009); *Alcoa Inc. v. FERC*, 564 F.3d 1342 (D.C. Cir. 2009); *Cal. Indep. Sys. Op. Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004); *Richmond Power and Light v. FERC*, 574 F.2d 610 (D.C. Cir. 1978); *Otter Tail Power Co. v. Fed. Power Comm'n*, 429 F.2d 232 (8th Cir. 1970).

B.  (1) Even if the emergency described by the Order did exist—it does not— the Department has not demonstrated a reasoned basis for its determination that additional dispatch of Campbell is necessary to "best meet the emergency and serve the public interest." 16 U.S.C. § 824a(c); 10 C.F.R. § 205.373; *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020); *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009); *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359 (1998); *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

---

[1] *See* Ex. 8 (Email from Cooke to Alle-Murphy) (recommending that "a party seeking rehearing can look for procedural guidance to [Federal Energy Regulatory Commission's ("FERC")] Rules of Practice and Procedure, 18 CFR Part 385.").

29 (1983); *NAACP v. Fed. Power Comm'n*, 425 U.S. 662 (1976); *Gulf States Utils. Co. v. Fed. Power Comm'n*, 411 U.S. 747 (1973); *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973); *California v. Fed. Power Comm'n*, 369 U.S. 482 (1962); *Pa. Water & Power Co. v. Fed. Power Comm'n*, 343 U.S. 414 (1952); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200 (D.C. Cir. 2013); *Chamber of Com. of the U.S. v. Secs. & Exch. Comm'n*, 412 F.3d 133 (D.C. Cir. 2005); *Sierra Club v. Env't. Prot. Agency*, 353 F.3d 976, 980 (D.C. Cir. 2004); *Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105 (D.C. Cir. 2001). And (2) the Order is unlawfully ambiguous, impermissibly vague, and does not provide fair notice of what MISO, Consumers Energy, and others are required to do. 16 U.S.C. § 824a(c); *Fed. Commc'ns Comm'n v. Fox Telev. Stations, Inc.*, 567 U.S. 239 (2012); *Grayned v. City of Rockford*, 408 U.S. 104 (1972); *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359 (1998).

C. The Order's availability requirements exceed the Department's authority. 16 U.S.C. §§ 824(a)–(b), 824a(b)–(c); *Gallardo v. Marstiller*, 596 U.S. 420 (2022); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260 (2016); *Gomez-Perez v. Potter*, 553 U.S. 474 (2008); *Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453 (1972); *Conn. Light & Power v. Fed. Power Comm'n*, 324 U.S. 515 (1945); *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009).

D. The Department has unlawfully failed to ensure that the Order compels generation only during hours necessary to meet the emergency and serve the public interest, that operations are consistent with any applicable environmental laws to the maximum extent practicable, and that any adverse environmental impacts are minimized. 16 U.S.C. § 824a(c)(2); *Fla. Power & Light Co. v. FERC*, 88 F.3d 1239 (D.C. Cir. 1996); *City of New Orleans v. FERC*, 67 F.3d 947 (D.C. Cir. 1995).

E. The Order and the Department's continued conduct are inconsistent with Departmental procedure, depriving the public and the Public Interest Organizations of fair notice and an adequate record. *Morton v. Ruiz*, 415 U.S. 199 (1974); *Mine Reclamation Corp. v. FERC*, 30 F.3d 1519 (D.C. Cir. 1994); *United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240 (2d Cir. 1977); DOE Rehearing Procedures.

## II. INTERVENORS' INTERESTS

As further discussed below, each of the Public Interest Organizations has interests that may be directly and substantially affected by the outcome of this proceeding. Each party may therefore intervene in this proceeding. DOE Rehearing Procedures; *see also* 18 C.F.R. § 385.215.

Each of the Public Interest Organizations also demonstrates a concrete injury arising from the Order that is redressable by a favorable outcome. Each organization is therefore aggrieved by the Department's Order and may properly apply for rehearing. *See* Federal Power Act, § 313(a), 16 U.S.C. § 825*l*(a); *Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105, 1112 (D.C. Cir. 2001); *NextEra Energy Res. v. ISO New Eng., Inc.*, 157 FERC ¶ 61,059, at P 5 (2016).

### A. Sierra Club

Sierra Club and its members are aggrieved by the Order. Over 17,500 Sierra Club members reside in Michigan; over two dozen of those members reside within just three miles of the Campbell Plant and thousands more live in nearby townships and further downwind. Sierra Club members are harmed by pollution produced by operating the Campbell Plant. The Order to operate the plant beyond its planned retirement date will subject Sierra Club members to additional air and water pollution in the areas where they live and recreate. Sierra Club members also hear the plant operating and hear and see open coal trains delivering coal to the plant. The Order's impact on the health, aesthetic, and recreational interests of Sierra Club members is heightened by the Order's failure to address the Federal Power Act's requirements for environmental protection that apply even in true emergencies (discussed in section IV.D below). In addition, Sierra Club members are ratepayers who may be subject to higher electric bills as a result of the Department's Order.

Sierra Club has a demonstrated organizational commitment to the above-described interests. Sierra Club's Beyond Coal Campaign seeks to reduce the pollution currently being produced by coal-fired power plants such as Campbell, and to reduce energy bills by ensuring that ratepayers do not fund the cost of continuing to operate uneconomic coal plants like Campbell. To those ends, Sierra Club has participated in multiple regulatory proceedings relating to the Campbell Plant. *See, e.g.*, Michigan Comm'n Case No. U-21224 (Consumers application for an increase in its electricity rates); Michigan Comm'n Case No. U-21090 (Consumers 2021 Integrated Resource Plan ("IRP")); Sierra Club Comments to Michigan Dep't of Env't, Great Lakes, and Energy on Nat'l Pollution Discharge Elimination System ("NPDES") Permit No. MI10001422 (May 21, 2021); Michigan Comm'n Case No. U-20165 (Consumers 2018 IRP); Sierra Club, Earthjustice, and Great Lakes Environmental Law Center Comments to Michigan Dep't of Env't, Great Lakes, and Energy on NPDES Permit No. MI10001422 (Apr. 22, 2018).

If the Order stands, Sierra Club will sustain an independent organizational injury in addition to those sustained through its members. As described in detail below, Campbell's planned retirement date of May 31, 2025 was the result of a settlement reached in Consumers' 2021 Integrated Resource Plan proceeding before the Michigan Commission. Sierra Club was heavily involved in the Integrated Resource Plan proceeding from its earliest stages and is a signatory to the

settlement. Sierra Club invested in participating (through staff, volunteers, and members) in multiple stakeholder meetings held by Consumers in 2020 to inform its Integrated Resource Plan filing, galvanized hundreds of its members to submit comments to Consumers, formally intervened once Consumers filed its Integrated Resource Plan, and sponsored extensive expert testimony in that proceeding to demonstrate that the Campbell Plant's existing and likely future costs fully justified its closure by 2025. The Order's attempt to override the settlement undermines Sierra Club's investments in the Integrated Resource Plan proceeding and its reliance on the results of the settlement, inflicting procedural and organizational harm on Sierra Club.

### B. Natural Resources Defense Council

Natural Resources Defense Council ("NRDC") is a national non-profit membership organization whose mission includes ensuring the rights of all people to clean air, clean water, and healthy communities. NRDC and its members are aggrieved by the Order, which threatens those fundamental rights. Over 15,781 NRDC members reside in Michigan and approximately 162 of those members reside within ten miles of the Campbell plant. These NRDC members are harmed by the order to operate the Campbell plant beyond its planned retirement date because continued operations will subject NRDC members to air and water pollution in the areas where they live, work, and recreate. NRDC members are also exposed to the noise and visual impacts of the plant's operation, including the delivery of coal via open coal trains. The impact of the Order on the health, aesthetic, and recreational interests of NRDC members is compounded by the Order's failure to address the Federal Power Act's requirements for environmental protection that apply even in true emergencies (discussed in section IV.D below). In addition, NRDC members are ratepayers in the MISO region who will be subject to higher electric bills as a result of the Order.

NRDC has a longstanding organizational commitment to protect the interests of its members and to reducing pollution caused by coal-fired power plants such as Campbell. To that end, NRDC has participated in multiple regulatory proceedings relating to the Campbell Plant. *See, e.g.*, Michigan Comm'n Case No. U-21224 (Consumers Energy Co. application for an increase in its electricity rates); Michigan Comm'n Case No. U-21090 (Consumers 2021 IRP); Michigan Comm'n Case No. U-20165 (Consumers 2018 IRP); Michigan Comm'n Case No. U-21585 (Consumers Electric Rate Case); Michigan Comm'n Case No. U-21816 (Consumers Renewable Energy Plan). NRDC also was a party to the 2022 settlement agreement with Consumers Energy for the closure of the Campbell Plant and the end of Consumers' use of coal by May 31, 2025.

7

### C. Michigan Environmental Council

Michigan Environmental Council ("MEC") is a statewide environmental nonprofit organization founded in 1980 and based in Lansing, Michigan. MEC has over 100 member groups and a collective membership of over 300,000 people who live, recreate, and consume energy in Michigan. On behalf of its members, MEC advocates at the local, state, and federal level for lasting protections of its members' health and economic well-being, as well as protections for Michigan's air, water, and land. This includes promoting policies that protect Michigan residential utility ratepayers, increase adoption of clean energy sources, reduce harmful pollution, and address the causes of climate change.

Since 1999, MEC's advocacy on these issues has included participation as an intervening party in hundreds of Michigan Commission cases to represent the interests of its members in lower-cost, cleaner energy generated from renewable sources. In 2022, MEC was a party to the settlement agreement with Consumers Energy that would result in the closure of the Campbell Plant and end Consumers' use of coal by May 31, 2025. This settlement was designed to provide reliable energy at significantly lower cost, while also improving public health and reducing harmful environmental impacts.

### D. Environmental Defense Fund

The Environmental Defense Fund ("EDF") is a nonprofit membership organization with hundreds of thousands of members nationwide, including more than nine thousand members in Michigan, whose mission is to build a vital Earth for everyone by preserving the natural systems on which all life depends. Guided by expertise in science, economics, law, and business partnerships, EDF seeks practical and lasting solutions to address environmental problems and protect human health, including in particular by addressing pollution from the power sector. On behalf of its members, EDF works with partners across the private and public sectors to engage in utility regulatory forums at the federal level and throughout the United States to advocate for policies that will create an affordable, reliable, and low pollution energy system. The Order harms EDF members because it will result in increased pollution that will impact the health of people and nature and because it will increase energy costs for EDF members throughout the MISO region.

### E. Environmental Law and Policy Center

Environmental Law and Policy Center ("ELPC") is a not-for-profit environmental organization with members, contributors, and offices throughout the Midwest, including in Michigan. Among other things, ELPC advocates before the Michigan Commission and the Federal Energy Regulatory Commission for clean,

8

reliable energy generation in order to reduce ratepayer costs and improve environmental outcomes. ELPC has a long history of participating in regulatory proceedings involving Consumers. *See, e.g.*, Michigan Comm'n Case No. U-21224 (Consumers Energy Co. application for an increase in its electricity rates); Michigan Comm'n Case No. U-21090 (Consumers 2021 IRP); Michigan Comm'n Case No. U-20165 (Consumers 2018 IRP); Michigan Comm'n Case No. U-20984 (Consumers Renewable Energy Plan); Michigan Comm'n Case No. U-21585 (Consumers Electric Rate Case); Michigan Comm'n Case No. U-21816 (Consumers Renewable Energy Plan). With respect to Campbell, ELPC played a key role in the 2021 Integrated Resource Plan proceeding from its earliest stages and is a signatory to the settlement agreement in which Consumers committed to retiring the Plant by May 31, 2025.

Since the settlement, ELPC has played a role in upholding the public's interest and refining the details as to the future of the Campbell site. In partnership with other stakeholders, ELPC has engaged and will continue to engage in negotiations with Consumers and other community members in pursuit of conservation, recreation, and clean energy goals at the site. ELPC members in Michigan will be harmed by the Order, as it delays the plant's retirement and may subject members to higher electric bills. Further, the Order's attempt to override the settlement undermines ELPC's investment in the Integrated Resource Plan proceeding and its reliance on the results of the settlement, inflicting procedural and organizational harm on ELPC.

*F. Vote Solar*

Vote Solar is an independent 501(c)(3) nonprofit working to re-power the U.S. with clean energy by making solar power more accessible and affordable through effective policy advocacy. In over half of the country, Vote Solar seeks to promote the development of solar at every scale, from distributed rooftop solar to large utility-scale plants. Vote Solar has over 90,000 members nationally, including 2,700 members in Michigan. Vote Solar is not a trade organization, nor does it have corporate members. Vote Solar has provided testimony and comments in many regulatory dockets in front of the Michigan Commission, including the 2021 Integrated Resource Plan proceeding. Vote Solar is committed to promoting clean, renewable energy and transitioning away from coal generation.

*G. Public Citizen*

Established in 1971, Public Citizen is a national, not-for-profit, non-partisan, research and advocacy organization representing the interests of household consumers. Public Citizen has over 500,000 members and supporters across the country, including those who pay electric utility bills in Michigan and in MISO. Public Citizen is active before the Federal Energy Regulatory Commission promoting just and reasonable rates, and supporting efforts for utilities to be

9

accountable to the public interest. Its interests in this proceeding are unique and cannot be represented by any other party. Financial details about the organization are on its website. Public Citizen, "Annual Reports," www.citizen.org/about/annual-report/.

### H. Union of Concerned Scientists

The Union of Concerned Scientists ("UCS") is a national non-profit organization headquartered in Cambridge, Massachusetts, with additional offices in Washington, D.C.; Berkeley, California; and Chicago, Illinois. UCS is a public interest organization with more than 55 years of experience advocating for science-based policies, including responsible energy policy and utility oversight at the state and federal levels, and with over a decade working in Michigan on these issues. UCS has approximately 5,800 supporters, 1,800 members, and 500 Science Network members that live, use electricity, and pay electric bills in Michigan, including in Consumers Energy's service territory. UCS intervened and participated fully as a party in Consumers' 2021 Integrated Resource Plan proceeding, including authoring expert testimony and supporting resolution of that case through the settlement agreement that included retirement of Campbell.

### I. The Ecology Center

The Ecology Center is a Michigan-based nonprofit organization headquartered in Ann Arbor, Michigan, with additional offices in Detroit, Michigan. Ecology Center is a public interest organization with more than 50 years of experience advocating for clean production, healthy communities, environmental justice, and a sustainable future. Ecology Center works at the local, state, and federal level. Its programs address systemic sources of poor health and environmental degradation through unique partnerships with environmental health and environmental advocates. Ecology Center has over 6000 members and supporters, that live, use electricity, and pay electric bills in Michigan, including in Consumers Energy's service territory. Ecology Center intervened and participated fully as a party in Consumers' 2021 Integrated Resource Plan proceeding, and supported resolution of that case through the settlement agreement that included retirement of Campbell.

### J. Urban Core Collective

The Urban Core Collective ("UCC") is a member-based organization in Grand Rapids, Michigan. As well as advocacy in strengthening democracy, leadership development and education reform, much of UCC's work has been in climate and environmental justice, specifically in policy which moves toward a transition to renewable sources of energy, energy that is affordable and reliable and which does not contribute to climate change. Our constituents are in the front lines, being affected first and most severely by its impacts. The UCC has intervened in Michigan Public Service Commission cases such as the Consumers Energy Electric

Rate Case (U-21585), the DTE Gas Rate Case (U-21291), and will be filing to intervene in Consumers Energy's electric rate case (Case No. U-21870) recently filed.

The UCC was heavily involved in engaging community members and collaborating with other stakeholders during the last Consumers Energy Integrated Resource Plan. The UCC advocated for the closing of the Campbell Coal Plan.

The UCC contests the reopening of the Campbell coal plant. Firstly, continuing to rely on coal-fired power contradicts efforts towards environmental justice. Communities near the plant, especially in Grand Rapids and surrounding areas, face heightened exposure to health risks like respiratory issues and heart disease due to pollution. Coal plants emit significant amounts of pollutants like sulfur dioxide, nitrogen oxides, and particulate matter, which can exacerbate health problems for vulnerable populations. The decision to keep the plant operational undermines the transition to cleaner energy sources, affecting air quality and contributing to climate change.

Lastly, there are other options to provide Michigan residents and the business community with clean, reliable and affordable energy which does not come from coal such as the Campbell coal plant.

## III. BACKGROUND

### A. *The Campbell Plant Does Not Benefit Consumers Energy's Customers.*

#### 1. *Campbell Is Old, Unreliable, Dirty, and Expensive.*

Located in West Olive, Michigan, 30 miles west of Grand Rapids, Campbell is a power plant that relies on burning coal to generate electricity. The plant has three generating units, which are between 45 and 63 years old. Ex. 11 at 7 (Blumenstock 2024 Direct Testimony). Units 1 and 2 are beyond the typical operational life of coal units, Ex. 3 at 15 (Powers Decl.) (*citing* Exs. 63 (Palgrave Handbook) and 64 (IEA Report)), and all three units have experienced long and recurrent outages in recent years that reflect aged, worn components that are expensive and may be difficult to repair or replace. *Id.* at 4, 15. In the tables below, and with further context in his declaration, Public Interest Organizations' expert engineer identifies the duration and reasons for the units' longest outages in the past two years based on Consumers' filings with the Michigan Commission. *Id.* at 5.

**Longest 2024 Outages by Type**

| Unit | Outage Description | Total Duration (hours) |
|---|---|---|
| 1 | • Degraded governing valve (3 outages)<br>• Worn leaking superheater tube (1 outage) | 911<br>491 |
| 2 | • Obsolete boiler feedwater pump failure (1 outage)<br>• Degraded valve(s) malfunction (3 outages)<br>• Worn equipment leaks, various (4 outages) | 1,417<br>1,723<br>854 |
| 3 | • Worn/failed turbine turning gear (1 outage)<br>• Worn tube leak (1 outage) | 1,104<br>356 |

The numbers above are rounded to the nearest hour.

**Longest 2023 Outages by Type**

| Unit | Outage Description | Total Duration (hours) |
|---|---|---|
| 1 | • Worn leaking valve and superheater tube (2 outages) | 661 |
| 2 | • Obsolete boiler feedwater pump failure (4 outages)<br>• Worn equipment leaks (3 outages) | 3,445<br>571 |
| 3 | • Worn leaking boiler/superheater tubes (3 outages)<br>• Worn/vibrating turbine bearings (1 outage) | 1,857<br>426 |

The numbers above are rounded to the nearest hour.

The outages demonstrate Campbell's increasing inability to consistently perform even under normal conditions, let alone to meet an emergency. All three Campbell units have been unexpectedly unable to produce power during significant portions of recent years (known as the units' "forced outage rate"[2]). *Id.* at 4 (*citing* Consumers' filings with the Michigan Commission). In 2023, the units' forced outage rates were 18.66% (Unit 1), 57.32% (Unit 2), and 22.41% (Unit 3). *Id.* In 2024, the rates were 14.84% (Unit 1), 48.07% (Unit 2), and 19.25% (Unit 3). *Id.* By contrast, the national average forced outage rate for coal-burning units is approximately 12%. *Id.*

Campbell has been a significant source of pollution. Each year when operating, the plant emitted around one hundred thousand pounds of air toxics, hundreds of thousands of pounds of particulate matter, many millions of pounds of nitrogen oxides and sulfur dioxide, and over ten billion pounds of carbon dioxide. *See* U.S. Environmental Protection Agency ("EPA"), ECHO, https://echo.epa.gov/air-pollutant-report-new?fid=110000411108 (last visited June 18, 2025); *see also* EPA, eGRID, https://www.epa.gov/egrid/egrid-pm25 (Jan. 15, 2025). In fact, the plant

---

[2] Consumers Energy typically uses the phrase "random outage rate" in place of "forced outage rate."

emitted more sulfur dioxide and particulate matter than any other plant in Consumers' generation fleet. Ex. 23 at 10–12 (Bilsback Direct Testimony). Campbell also used approximately *one billion gallons* of water per day from Lake Michigan while discharging significant amounts of contaminated wastewater back into the lake. *See* Ex. 3 at 21 (Powers Decl.) (*citing* Ex. 48 (2021 CWA Permit)). In 2023, for example, the plant discharged approximately 96,000 pounds of pollution, including 10,000 pounds of toxic metals, into Lake Michigan. EPA, ECHO, https://echo.epa.gov/detailed-facility-report?fid=110000411108 (last visited June 18, 2025). Additionally, burning coal at the plant creates toxic coal ash. The plant already holds roughly 6.2 million cubic yards of coal ash in an on-site landfill. Ex. 47 at 4 (2024 Campbell Coal Ash Inspection Report).

Campbell's pollution harms its neighbors. Prior expert analysis of the Campbell units' pollution found that retiring the plant would eliminate annual emissions into the air of 538 tons of particulate matter, 13 tons of volatile organic compounds, 2,918 tons of nitrogen oxides, 5,244 tons of sulfur dioxide, and 8.2 million tons of carbon dioxide emissions based on 2019 operational levels. Ex. 23 at 11 (Bilsback Direct Testimony). Each year, those emissions led to modeled mortality impacts of 36–81 premature deaths and $389–$879 million in health impact costs, including non-fatal respiratory and cardiovascular harms affecting people. *Id.* at 15. According to the Michigan Department of Environment, Great Lakes, and Energy, the census tract in which Campbell is located has far more "adverse environmental factors"—like water pollution and proximity to toxic waste dumps—than the rest of the state, and also has a high socioeconomically vulnerable population compared to the rest of the state. Mich. Dep't of Env't, Great Lakes, and Energy, MiEJScreen, https://www.michigan.gov/egle/maps-data/miejscreen (last visited June 18, 2025). Nearby Grand Rapids has communities that are significantly overburdened by environmental pollution and populations that are uniquely sensitive to pollution due to socioeconomic factors, high rates of disease, and other factors. *Id.*

Campbell is also an expensive plant to run. In 2021, Consumers projected that retiring Campbell in 2025 would avoid $365,008,000 in capital expenditures and major maintenance costs. Ex. 13 at 3–4 (Kapala Direct Testimony) (summing "avoided capital expenditures" and "avoided major maintenance expenses" for Units 1–3). At that time, the cost of power generated by Campbell—including capital, operation, maintenance, and fuel costs—was $33.64 per megawatt hour ("MWh"). Ex. 49 (2025 Energy Innovation Dataset) (compiling data from the U.S. Energy Information Administration). Campbell has gotten even more expensive to run since then. In 2024, the cost of Campbell's power rose to $40.65 per MWh, a 21% increase over the 2021 cost. *Id.* This means the cost of Campbell's power grew significantly faster than inflation (roughly 16%) over the same period. Ex. 50 at 3 (2025 Energy Innovation Coal Cost Report); *see also* Ex. 51 at 12 (2023 Energy Innovation Coal Cost Report) (describing the same methodology used in the 2025 report).

13

All of these harms could be avoided by retiring Campbell. As further discussed below, Consumers Energy wanted to retire the plant on May 31, 2025. The Michigan Commission and the regional grid operator MISO approved the retirement.

### 2. *Consumers Energy Is a Utility in MISO.*

Consumers Energy is the second largest electric utility in Michigan. The utility serves 1.9 million customers across a broad swath of the state's Lower Peninsula.

To meet its customers' energy needs, Consumers owns and operates, or contracts for, a wide array of resources, including gas, oil, hydroelectric, renewables, and hydro-pumped storage. *See* Ex. 27 (2028/2029 Consumers Capacity Demonstration); Ex. 11 at 7 (Blumenstock 2024 Direct Testimony). Consumers also deploys load-modifying resources that significantly reduce energy needs during periods of peak demand. Ex. 27 at PDF 50 (2028/2029 Consumers Capacity Demonstration).

Consumers is also a MISO member, meaning among other things that it participates in MISO-run wholesale interstate markets including energy, ancillary service, and capacity markets, and that it allows MISO to operate its transmission grid. Like most other electric utilities in Michigan, Consumers elected to join MISO (then known as the Midwest Independent Transmission System Operator, Inc.) in the years that followed FERC's issuance of Order No. 888 in 1996 (creating a framework for the creation of Regional Transmission Organizations), MISO's founding in 1998, and FERC's issuance of Order No. 2000 in 1999 (encouraging transmission-owning electric utilities to join Regional Transmission Organizations). *See generally Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities and Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, 61 Fed. Reg. 21,540 (May 10, 1996); *Regional Transmission Organizations*, Order No. 2000, 89 FERC ¶ 61,285 (1999).

## B. *Multiple Authorities Already Protect Resource Adequacy.*

As discussed below, Consumers has consistently maintained resource adequacy within its own service territory. Additionally, the resources procured by Consumers and other electric utilities in Michigan have collectively done the same throughout the Lower Peninsula of Michigan. Meanwhile, Consumers is within a larger system also overseeing and safeguarding resource adequacy.

### 1. *MISO Protects Resource Adequacy Through Reserve Margin Requirements and a Residual Capacity Auction.*

MISO is the grid operator for territory stretching roughly from North Dakota to Michigan and down to Louisiana. This territory is organized into zones numbered 1 through 10, as shown in MISO's FERC-approved tariff and reproduced below.



MISO implements resource adequacy standards across its territory to ensure it achieves a level of grid reliability meeting both industry standards and those of the North American Electric Reliability Corporation ("NERC"). To meet its resource adequacy requirements, MISO utilizes a series of interconnected mechanisms that both measure current and future system needs and help the utilities in its region secure the resources that best meet those needs at least cost. *See generally* Ex. 46 at 66–75, 87–90 (FERC Energy Primer).

   i.   Reserve Margin Requirements.

The foundation of MISO's resource adequacy implementation process is its Loss of Load Expectation ("LOLE") study, which measures whether available generation capacity is capable of meeting load demand under various conditions, including low probability but high impact events (such as extreme weather). *See generally* Ex. 38 (MISO LOLE Presentation). MISO runs its LOLE study every year. It utilizes a systemic model, taking inputs from the past thirty years of weather data as well as resource performance characteristics from a broad range of operating conditions. Using this wealth of information, MISO then runs thousands of simulations looking to future years. Each of the simulations examines the system at every individual hour of each year being studied. These simulations thereby identify circumstances that could most stress the system, while also predicting how the system's fleet of resources will perform. Ex. 58 (MISO Tariff Module E-1 – Resource Adequacy). MISO runs this model annually, based on the latest available data.

MISO uses its LOLE study results in conjunction with its system-wide peak demand forecast, which it develops from projections provided by each of the load-

15

serving entities within its territory. It combines these inputs to determine how much generating capacity is required to meet MISO's industry-standard goal of experiencing no more than one loss-of-load event every ten years. *See* Ex. 2 at 2–5 (Grid Strategies Report). The result of this calculation is a reasonable buffer of extra capacity to account for potential emergencies and other conditions, which is known as the regional Planning Reserve Margin ("Reserve Margin"). The Reserve Margin, stated as a percentage, reflects the amount of generating capacity that must be procured in each season to meet resource adequacy standards across the region. MISO develops a separate Reserve Margin for each season of the year. An illustrative calculation of a Reserve Margin is below.

### Illustrative Reserve Margin Calculation

| | |
|---|---|
| Expected Peak Demand | 100,000 MW |
| Extra Buffer | 7,000 MW |
| **Reserve Margin** | **7%** |

After developing the system-wide Reserve Margin, MISO uses it to convert the peak demand projection for each zone into a capacity requirement (in accredited megawatts, or "MW") that each zone must meet for each season. The requirement for each zone is known as that zone's Planning Reserve Margin Requirement ("Reserve Margin Requirement"), which is the amount of megawatts of capacity that must be procured for each zone. These megawatts can come from inside or outside the zone, so long as they are deliverable to the zone.

As with the zonal calculation, MISO also converts each individual load-serving entity's projected peak demand into a capacity requirement using the system-wide Reserve Margin. A load-serving entity is, like Consumers, an entity that "has undertaken an obligation to serve [l]oad for end-use customers by statute, franchise, regulatory requirement or contract." *See* MISO's FERC-Approved Tariff at Module A, *available at* https://etariff.ferc.gov/TariffBrowser.aspx?tid=1162. And the Reserve Margin Requirement for each zone is, roughly speaking, the sum of all load-serving entities' obligations in that zone.

MISO assigns to each individual resource a capacity value based on its conservative estimate of how likely that generator is to be able to provide energy during peak net demand conditions. The purpose of this estimate is to determine a percentage of resources' maximum capacity (their "accredited capacity") that can be used by load-serving entities to achieve their Reserve Margin Requirements, and it reflects that resources cannot always ensure that they will operate at their maximum possible capacity. Generally speaking, MISO's approach combines probabilistic modeling with historic and unit-specific performance. Through the capacity accreditation process, MISO fully accounts for the limitations of each resource's ability to contribute to MISO's resource adequacy during peak demand conditions or during times of overall system stress (e.g. when extreme weather affects unit performance). And MISO's capacity accreditation rules are regulated

16

and overseen by FERC. *See, e.g.*, *Midcontinent Indep. Sys. Op., Inc.*, 180 FERC
¶ 61,141, at P 1 (2022) (approving MISO's seasonal resource adequacy construct);
*see also Midcontinent Indep. Sys. Op., Inc.*, 189 FERC ¶ 61,065, at P 1 (2024)
(approving new methodology applicable to 2028/2029 delivery year).

ii.  MISO's Residual Capacity Market.

Finally, once MISO has (1) established the regional Reserve Margin,
(2) converted it to a Reserve Margin Requirement for each zone using peak demand
projections, (3) apportioned each zone's Reserve Margin Requirement among load-
serving entities, and (4) determined all eligible resources' accredited capacity, the
load-serving entities must meet their capacity obligations. Load-serving entities
have a few options for procuring capacity. First, they can use generating capacity
they already own. Second, they can contract with another entity that owns
generating capacity to promise to sell energy in the future when called upon by
MISO to do so. Third, as a final fallback option they can obtain capacity through a
residual capacity market run by MISO known as the Planning Resource Auction
("Planning Auction").

MISO conducts the Planning Auction every year. The Planning Auction is
actually four separate simultaneous seasonal auctions. In each auction, MISO
solicits operational commitments for the season from a suite of generation resources
that will ensure resource adequacy. Many resources provide an "offer" identifying
what price they would need to be paid to keep operational (*i.e.*, remain capable of
delivering power upon command) all or part of the resource's accredited capacity for
each of the four seasons. Other resources, including those already committed to
operate via outside contracts, are self-scheduled into the auction process, meaning
that MISO treats them as price takers or $0 offers. MISO then stacks each of these
resources in ascending cost order, forming a supply curve.

The supply curve crosses a preset sloped demand curve, known as the Reliability
Based Demand Curve. The sloped demand curve is designed by MISO to procure a
certain amount of capacity at each price point; although it is tethered around
MISO's goal of experiencing no more than one loss of load event per decade, it will
obtain more capacity if it is cheaper and less if it is more expensive. This is
consistent with the general principle that grid operators must always balance the
tradeoff between resource adequacy and cost. *See* Ex. 2 at 2–3 (Grid Strategies
Report).

The point where the supply and demand curves intersect is called the capacity
market clearing price. All resources on the supply curve with offers at or below that
amount are then committed to remain operational and be available for the
respective season(s) in which they cleared, with the owners of those resources'
capacity rights receiving the clearing price. Ex. 58 (MISO Tariff Module E-1).

2. *Michigan Protects Resource Adequacy Through Integrated Resource Planning and Annual Capacity Demonstration Requirements.*

MISO is not the only entity monitoring resource adequacy. Michigan, like other states in MISO, closely watches this too.

Michigan state law requires that electric utilities file an Integrated Resource Plan with the Michigan Public Service Commission at least every five years. MCL § 460.6t. Those Integrated Resource Plans serve both to ensure resource adequacy and to ensure implementation of the state's and each utility's preferred mix of generation. *See generally Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 205 (1983) (explaining that states have characteristically governed the need for new power facilities and their economic feasibility); *Citizens Action Coal. v. FERC*, 125 F.4th 229, 239 (D.C. Cir. 2025) ("[T]he States retain authority to choose their preferred mix of energy generation resources."). Pursuant to state law, the Integrated Resource Plan is required to:

> Provide . . . a 5-year, 10-year, and 15-year projection of the utility's load obligations and a plan to meet those obligations, to meet the utility's requirements to provide generation reliability, including meeting planning reserve margin and local clearing requirements determined by the commission or the appropriate independent system operator, and to meet all applicable state and federal reliability and environmental regulations over the ensuing term of the plan.

MCL § 460.6t(3). Each Integrated Resource Plan must include a broad range of information and analysis regarding forecasted energy and capacity needs, supply-side generating resources (*i.e.*, electric generating facilities), and demand-side resources such as energy waste reduction and demand response measures. *Id.* § 460.6t(5).

The Integrated Resource Plan statute requires the Michigan Commission to establish modeling scenarios and assumptions to be used in each Integrated Resource Plan filing. *Id.* §§ 460.6t(1) (modeling scenarios and assumptions), 460.6t(3) (filing requirements). Once an Integrated Resource Plan is filed, the Michigan Commission reviews the plan through a year-long contested case process under the Michigan Administrative Procedures Act, *see id.* §§ 460.6t(7), 24.271–.288, pursuant to which interested parties may intervene, conduct discovery, submit expert testimony, and present and cross-examine witnesses at an evidentiary hearing. The Michigan Commission is statutorily required to approve an Integrated Resource Plan if it determines that "[t]he proposed integrated resource plan represents the most reasonable and prudent means of meeting the electric utility's energy and capacity needs." *Id.* § 460.6t(8)(a). In deciding whether the Integrated Resource Plan satisfies that standard, the statute directs the Michigan Commission to consider several factors, including resource adequacy and capacity to serve

18

anticipated peak electric load, applicable planning reserve margin, and local clearing requirement; reliability; commodity price risks; and diversity of generation supply. *Id.*

Under Michigan law, electric utilities are also required to make annual capacity demonstration filings that project the utility's capacity position over a four-year planning period. *Id.* § 460.6w. After auditing each year's submissions, the Michigan Commission Staff prepares an annual report that discusses resource adequacy throughout the state. *See, e.g.*, Ex. 28 at 16 (2028/2029 Michigan Commission Staff Capacity Demonstration Results) (finding that Michigan meets resource adequacy requirements).

### 3. NERC Protects Resource Adequacy Through Standards and Regular Assessments.

The North American Electric Reliability Corporation ("NERC") is the Electric Reliability Organization responsible for developing mandatory reliability standards, subject to FERC's review and approval. Ex. 2 at 7 (Grid Strategies Report). NERC also annually assesses seasonal and long-term reliability of the bulk power system and monitors system performance. *Id.* at 7–8. NERC's assessments and activities are further discussed *infra* in section IV.A.2.iii.

### C. Campbell's May 31, 2025 Retirement and Resource Adequacy in Summer 2025 Have Been Carefully Planned.

### 1. Campbell's May 31, 2025 Retirement Was the Product of Careful Planning from Diverse Stakeholders Under a Settlement that Improves Resource Adequacy.

In 2021, Consumers Energy filed an Integrated Resource Plan that proposed retiring the Campbell Plant in 2025, acquiring the 1,176 MW New Covert gas plant in 2023, and making substantial investments in new generation and storage resources. Following a lengthy contested case process—with thousands of pages of testimony, multiple rounds of briefing, and an evidentiary hearing—the Michigan Commission approved in 2022 a comprehensive settlement agreement ("2022 Settlement") that established Consumers' long-term resource plan and provided for Campbell's May 31, 2025 retirement. Ex. 9 at PDF 95, 100–02 (Order Approving Campbell Settlement Agreement and Settlement Agreement). The 2022 Settlement was negotiated and signed by a wide array of parties in the Integrated Resource Plan case, including:

19

- Michigan Commission Staff;
- Michigan's Attorney General;
- Consumers Energy;
- residential ratepayer advocates;
- commercial and industrial customers;
- businesses in the energy sector;
- advocacy groups such as Sierra Club, Natural Resources Defense Council, Michigan Environmental Council, Environmental Law and Policy Center, Vote Solar, and Urban Core Collective;
- a transmission company; and
- third-party energy developers.

*Id.* at PDF 116–130; Ex. 18 at 5–6 (Proudfoot Rebuttal Testimony); *see also* Ex. 53 (Consumers News Release) ("A key regulatory decision today cleared the way for Consumers Energy to stop burning coal to generate electricity by 2025 — 15 years faster than previously planned — and provide reliable electricity for Michigan . . . A broad coalition of supporters for the plan includes customer groups, environmental organizations, MPSC staff, energy industry representatives and the Michigan Attorney General.").

While the 2022 Settlement included some elements of Consumers' original Integrated Resource Plan, such as acquiring the New Covert gas plant, it also made several changes that further bolstered the plan's ability to ensure resource adequacy both within the state and across MISO. In particular, as part of the 2022 Settlement, Consumers agreed to extend to 2031 the operation of two oil- and gas-fired peaker units at the utility's Karn plant from their originally proposed retirement date of 2023. Ex. 9 at PDF 101–02 (Order Approving Campbell Settlement Agreement and Settlement Agreement). Doing so added approximately 784 MW of generating capacity compared to the original plan. Ex. 56 at 21 (Blumenstock 2021 Second Rebuttal Testimony); Ex. 19 at PDF 94 (Walz Direct Testimony). Under the 2022 Settlement, Consumers would also solicit power purchase agreements to provide capacity beginning in the 2025/2026 planning year. Ex. 9 at PDF 103–04 (Order Approving Campbell Settlement Agreement and Settlement Agreement). Such solicitation would be for up to 500 MW of thermal generation, and up to 200 MW of clean energy resources. *Id.* Under the settlement, Consumers would also add new battery storage assets (a dispatchable resource) in the 2024–2027 timeframe. *Id.* at PDF 101; Ex. 57 at 18 (Jester 2021 Direct Testimony).

In approving the 2022 Settlement, the Michigan Commission specifically addressed the importance of maintaining resource adequacy. Ex. 9 at PDF 93–95 (Order Approving Campbell Settlement Agreement and Settlement Agreement). The Commission imposed requirements to consider resource adequacy for a utility's own customers, MISO zones, and other regions. *Id.* at PDF 93. It found that the plan embodied in the settlement was supported by substantial evidence and "is the

most reasonable and prudent means of meeting Consumers' energy and capacity needs and otherwise meets the requirements of" Michigan's Integrated Resource Plan statute. *Id.* at PDF 95.

A few parties challenged the 2022 Settlement on various grounds. Of note, Wolverine Power Supply Cooperative ("Wolverine"), a minority owner of Campbell Unit 3 with a stake less than 2%,[3] raised concerns about resource adequacy.

The Michigan Commission explained why objections to the settlement based on resource adequacy were unpersuasive. The Michigan Commission discussed the record evidence regarding acquisition of the 1,176 MW New Covert gas-fired power plant, extended operation of Karn units 3 and 4, new battery storage, and ongoing investments in solar, energy waste reduction, and demand response. *Id.* at PDF 90–93. The Michigan Commission then found that "the approval of the settlement agreement enhances zonal resource adequacy in the short, medium, and long term(s)." *Id.* at PDF 92. As such, the Michigan Commission found that the 2022 Settlement "provides a reasonable and prudent plan for meeting resource adequacy requirements." *Id.* at PDF 91.

Wolverine in turn appealed the Michigan Commission's decision to the Michigan Court of Appeals. The court rejected the challenge, noting in part that Wolverine "mischaracterize[d]" the Michigan Commission's handling of the resource adequacy issue, and "fail[ed] to address the substantive basis for the [Michigan Commission's] conclusion" that the 2022 Settlement properly addressed resource adequacy. *Wolverine Power Supply Coop., Inc. v. Mich. Pub. Serv. Comm'n*, No. 362294, 2023 WL 2620437, at *5 (Mich. Ct. App. Mar. 23, 2023).

### 2. *MISO Approved Campbell's May 31, 2025 Retirement Upon Finding No Reliability Violations.*

Pursuant to MISO's FERC-approved tariff, a utility within MISO seeking to suspend the operation of a generating unit must provide an "Attachment Y" notice to MISO. Ex. 60 at 1 (MISO Tariff Section 38.2.7); Ex. 61 (MISO Tariff Attachment Y); *see also* MISO's FERC-Approved Tariff at Attachment Y, *available at* https://etariff.ferc.gov/TariffBrowser.aspx?tid=1162 (containing prior versions of the

---

[3] Consumers owns about 93% of Unit 3, the Michigan Public Power Agency owns 4.8%, and Wolverine owns less than 2%. Ex. 24 at 2 ¶ 4 (Mich. Pub. Power Agency Petition to Intervene); Ex. 13 at 6 (Kapala Direct Testimony); Ex. 20 at PDF 28 (King Direct Testimony). The Michigan Public Power Agency did not oppose Consumers' decision to retire Unit 3. Under the ownership agreements that govern Unit 3, Consumers has the sole authority to decide when to retire it. Ex. 20 at 95 (King Direct Testimony).

tariff). The purpose of the notice is to enable MISO to evaluate the potential local grid reliability impacts of such suspension. *See* Ex. 60 at 1.

Consumers submitted the required notice to MISO in December 2021. Ex. 29 at PDF 6 (2024 Consumers ELG Annual Report). Consumers stated its intent to suspend operation of Campbell Units 1–3 effective June 1, 2025. *Id.*

In March 2022, MISO notified Consumers that it had reviewed the Campbell retirement for "power system reliability impacts," and concluded that retirement "would not result in violations of applicable reliability criteria." *Id.* at PDF 9. As such, MISO concluded that the retirement could proceed "without the need for the generators to be designated as a System Support Resource ('SSR') units [*sic*]," a designation that allows MISO to retain generators needed for reliability reasons. *See id.* MISO has not acted to revise its conclusion that Campbell could retire without implicating local reliability issues in the area around the facility.

### 3. *Consumers Has Been Winding Down Campbell and Ramping Up Replacement Resources.*

Following its filing of the Integrated Resource Plan and the Michigan Commission's approval of the 2022 Settlement, Consumers changed its approach to Campbell. Rather than invest in and maintain the plant to provide an adequate level of reliability, Consumers transitioned to a reactive, "fix it if breaks" approach to Units 1–3. Ex. 3 at 15–16 (Powers Decl.). Public Interest Organizations' expert engineer provides the following summary of the significant decline in investment and maintenance of the units. *Id.* at 6 (developed based on testimony from Consumers witnesses Kapala and Blumenstock, Exs. 10–13).

#### Reductions in Capital and Major Maintenance Spending at Campbell for 2022–2025

| | Pre-IRP Projected Spend | Post-IRP Actual/Projected Spend | Reduction |
|---|---|---|---|
| **Capital Spending** | | | |
| Units 1&2 | $60.6 Million | $4.1 Million | 93% |
| Unit 3 | $85.5 Million | $8.4 Million | 90% |
| **Major Maintenance Spending** | | | |
| Units 1&2 | $14.4 Million | $5.5 Million | 62% |
| Unit 3 | $23.5 Million | $5.1 Million | 78% |

The figures above are rounded to the nearest decimal shown. "IRP" refers to Consumers' 2021 Integrated Resource Plan proceeding, which concluded with the Michigan Commission's approval of the 2022 Settlement.

The expert engineer further details Consumers' canceled projects and explains the cancellations' likely impact on the units' reliability. *Id.* at 5–16. As just one example among the dozens that he identifies, Consumers canceled a $7.9 million

turbine overhaul project to maintain Unit 3 scheduled to take place in 2024. *Id.* at 13, 16. In April 2024, the turbine failed, resulting in a 46-day outage. *Id.* The turbine was eventually repaired, but *only for the limited objective of allowing Unit 3 to continue to operate until the planned retirement in May 2025. Id.* at 5 n.9, 13, 16.

As a result of the canceled projects and forgone maintenance and investment, it is unlikely that Campbell can reliably dispatch without significant further expense. *Id.* at 5–6, 13, 15–17. The Chair of the Michigan Commission reportedly believes the costs to render Campbell operational range from a minimum of tens of millions of dollars to close to $100,000,000. Ella Nilsen, CNN, *The Trump Admin Ordered a Coal Power Plant to Stay on Past Retirement. Customers in 15 States Will Foot the Bill* (June 6, 2025), https://www.cnn.com/2025/06/06/climate/michigan-coal-plant-energy-cost-wright.

The evidence bears out the plant's unreliability. As explained above in section III.A.1, the Campbell units have demonstrated their inability to consistently perform in recent years. This unreliability reflects the impact of worn and difficult-to-repair or replace components, causing outages that tended to be long and recurrent. Ex. 3 at 4 (Powers Decl.).

At the same time that Consumers has prepared to retire the aging and increasingly unreliable units at Campbell, Consumers has taken multiple steps over the last several years to bring substantial new generating capacity online that bolsters resource adequacy and reliability in Michigan, MISO Zone 7, and the region. In the years since the Michigan Commission approved Consumers' 2021 Integrated Resource Plan, and since MISO's considered determination that retiring Campbell did not present reliability concerns, Consumers proceeded with acquiring or constructing many of the generating assets called for under the 2022 Settlement. In 2023, Consumers completed its acquisition of the Covert plant, a three-unit combined cycle gas plant. Ex. 12 at 8 (Blumenstock 2025 Direct Testimony). By acquiring Covert and transferring the plant to MISO, Consumers added 1,090 MW of net generating capacity to MISO Zone 7. Ex. 21 at 7–9 (Bleckman Direct Testimony); *see also* Ex. 22 at 8 (Hahn Direct Testimony). Consumers has continued developing renewable assets, including a 198 MW wind facility that went into service in 2024, and several solar projects, totaling 1,421 MW, with commercial operation dates in 2026–28. Ex. 21 at 7–9 (Bleckman Direct Testimony). Ultimately, Consumers intends to develop 6.6 gigawatts ("GW") of solar and wind generation resources. *Id.* at 8. Consumers has also entered into long-term contracts for three large battery storage projects, a power purchase agreement that will provide 175 accredited MW of gas-fired generation capacity in the 2025 and 2026 MISO planning years, and another power purchase agreement providing a further 100 MW of capacity in the 2025–27 planning years. Ex. 12 at 8–9 (Blumenstock 2025 Direct Testimony).

23

### 4. *Consumers Has Continued to Demonstrate Resource Adequacy.*

Apart from the Integrated Resource Plan proceeding—which, as noted above, resulted in a plan that bolsters resource adequacy in MISO—Consumers has also consistently met Michigan's resource adequacy requirements to demonstrate capacity each year under MCL section 460.6w. Consumers' filings have consistently shown that the company is maintaining and procuring sufficient capacity to serve its customers, while meeting the necessary reserve margin. Ex. 25 (2026 Consumers Energy Capacity Demonstration); Ex. 26 (2027/2028 Consumers Energy Capacity Demonstration); Ex. 27 (2028/2029 Consumers Capacity Demonstration). For the Summer 2025 season—the timeframe that is the subject of DOE's Order—Consumers has surplus resources. Ex. 27 at PDF 14 (Consumers 2028/2029 Capacity Demonstration). And as discussed in its most recent annual report, issued on May 12, 2025, the Michigan Commission Staff found that Consumers meets resource adequacy requirements for both the 2025/26 year, and through the 2028/29 year. Ex. 28 at 16. As a result of the most recent MISO Planning Resource Auction, the Michigan Commission Staff noted that MISO Zone 7 "cleared above seasonal reliability targets, representing additional reliability value at cost competitive prices." *Id.*

### 5. *MISO Has More Resources than It Needs to Ensure Resource Adequacy in Summer 2025.*

MISO published the results of its LOLE study for Summer 2025—the timeframe that is the subject of DOE's Order—in mid-March. *See* Ex. 31 at 2 (MISO 2025–26 Auction Results). In that study, MISO concluded that an overall Reserve Margin of 7.9% above peak load projections would be adequate to maintain the overall resource adequacy of the MISO region. *Id.* Here is MISO's calculation.

### MISO's Summer 2025 Reserve Margin Calculation

| | |
|---|---|
| Expected Peak Demand[4] | 125,313.3 MW |
| Extra Buffer | 9,900.1 MW |
| **Reserve Margin** | **7.9%** |

MISO published the results of its Planning Auction process for Summer 2025 at the end of April 2025. Those results demonstrate that MISO secured more than sufficient resources to achieve resource adequacy for Summer 2025. In fact, consistent with the design of its Reliability Based Demand Curve, MISO secured an overall 9.8% Reserve Margin—almost two percentage points more than the 7.9%

---

[4] The figure shown here adds approximately 2,700 MW to actual expected peak demand to account for electric energy losses as the power moves through the transmission system, consistent with MISO's approach. *See* Ex. 59 (MISO 2025–2026 Prelim. PRA Report with Final Results).

24

target that MISO determined was needed to meet resource adequacy requirements. Ex. 31 at 5 (MISO 2025–26 Auction Results).

MISO's Planning Auction also secured adequate local offers to maintain resource adequacy in MISO Zone 7, which covers almost the entirety of Michigan's Lower Peninsula. Specifically, Zone 7's accredited offers from local resources were over 98% of the Zone's required Reserve Margin in Summer 2025, which in combination with transmission availability from neighboring Zones was more than enough to maintain the Zone's resource adequacy. *Id.* at 18 (demonstrating that Zone 7 had sufficient local offers to easily exceed, by 1.2 GW, its Local Clearing Requirement, which is the minimum amount of local resource offers that must be located within each Zone); *see* Ex. 2 at 10. This means Zone 7 also has plenty of leftover headroom on its transmission connections with neighboring regions to meet unexpected circumstances.

Additionally, in real-time and near-term operations, MISO will be able to employ the flexibility provided by its markets, including the energy and ancillary services markets. *Id.* at 5–6. Through the ancillary services market, for instance, MISO can procure services like operating reserves from flexible resources that help balance fast variability in supply and demand. *Id.* And MISO has numerous additional tools it can employ in stepwise fashion should it encounter a risk of a generation shortage in real-time operations. *Id.* at 6–7.

### 6.  *FERC's Recent Technical Conference Confirms that MISO Has Adequate Resources for Summer 2025.*

Recently, FERC held a technical conference to address, among other things, resource adequacy in MISO. Ex. 62 at 13 (FERC Technical Conference Notice). The technical conference focused on long-term planning issues, not any purported short-term emergency. *See id.* at 13–17.

To the extent short-term conditions were addressed, witnesses dispelled the notion that MISO is experiencing a resource adequacy emergency. MISO's representative testified that no capacity deficits have materialized in 2025. Ex. 34 (Ramey MISO Comments). Similarly, the Independent Market Monitor for MISO, whose job is to scrutinize the performance of MISO's markets and related procedures for efficiency and efficacy, emphasized that "MISO is *more than* adequate moving into the Summer of 2025, and [he does] not have substantial concerns about the MISO region in the near term." Ex. 35 at 2 (Patton MISO Comments) (emphasis added). The technical conference further demonstrates that normal processes are unfolding to address long-term issues.

IV. Request for Rehearing

A. *The Order Exceeds the Department's Authority Because the Department Has Not Demonstrated, and Cannot Demonstrate, an Emergency Necessitating Continued Operation of the Campbell Plant.*

The Order exceeds the Department's authority because there is no emergency within the meaning of Section 202(c). Both MISO and Michigan have confirmed the absence of any immediate resource shortfall, and the sources cited by the Order only confirm that absence.

1. *Section 202(c) Only Authorizes the Department to Respond to Specific, Imminent, and Temporary Events Necessitating Immediate Response.*

Section 202(c) of the Federal Power Act allows the Department to order "the generation . . . of electric energy" only "[d]uring the continuance of any war in which the United States is engaged," or if "the [Department] determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy or of fuel or water for generating facilities, or other causes." 16 U.S.C. § 824a(c)(1). That provision's fundamental textual requirement—an "emergency"—limits the Department's authority to immediate, unexpected circumstances that cannot be otherwise avoided. An emergency is "an unforeseen combination of circumstances or the resulting state that calls for *immediate* action." Merriam Webster's Dictionary 407 (11th ed. 2009) (emphasis added).[5] And the statute's use of the present tense—"exists"—demands, at a minimum, that the emergency be imminent and certain rather than distant and contingent. *See also* 16 U.S.C. § 824a(c) (empowering Department only "during" an existing emergency).

The remainder of Section 202(c) underscores the exigency inherent in the governing term "emergency": the authority granted by Section 202(c) is, in the first instance, a war-time power. 16 U.S.C. § 824a(c) (beginning with "[d]uring the continuance of any war in which the United States is engaged"); *see Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307 (1961) (noting that statutory terms should be interpreted in the context of nearby parallel terms "in order to avoid the giving of unintended breadth to the Acts of Congress"). An "emergency" under the statute is limited to circumstances of similar urgency: "a *sudden* increase in the demand for electric energy," for example. 16 U.S.C. § 824a(c) (emphasis added); *see Richmond*

---

[5] 3 Oxford English Dictionary 119 (1st ed. 1913) (defining emergency similarly as "a state of things *unexpectedly* arising, and urgently demanding *immediate* action" (emphasis added)); *see also* Benjamin Rolsma, *The New Reliability Override,* 57 Conn. L. Rev. 789, 812 n.147 (2025) (noting that dictionaries have given the term "emergency" the "same meaning for many years").

*Power and Light v. FERC*, 574 F.2d 610, 615 (D.C. Cir. 1978) (holding that Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances"); S. Rep. No. 74-621, at 49 (1935) (explaining that Section 202(c) provides "temporary power designed to avoid a repetition of the conditions during the last war, when a serious power shortage arose").[6]

Section 202(c) is further limited to actions addressing temporary shortfalls in supply—it provides no power to implement long-term policy preferences, including preferences for particular sources or fuels. The statute "is aimed at situations in which demand for electricity exceeds supply and not at those in which supply is adequate but a means of fueling its production is in disfavor." *Richmond Power and Light*, 574 F.2d at 615. Nor, more fundamentally, does Section 202(c) allow the Department to override a state's choice of the appropriate mix of in-state generation. *Emergency Interconnection of Electric Facilities and the Transfer of Electricity to Alleviate an Emergency Shortage of Electric Power,* 46 Fed. Reg. 39,984, 39,985 (Aug. 6, 1981) (recognizing that the Department cannot, via Section 202(c), "replace prudent utility planning and system expansion"); *see also Hughes v. Talen Energy Mktg., LLC,* 578 U.S. 150, 154 (2016) (noting the "States' reserved authority . . . over in-state 'facilities used for the generation of electric energy'" (quoting 16 U.S.C. 824(b)(1)); *Citizens Action*, 125 F.4th at 238–39 ("[T]he States retain authority to choose their preferred mix of energy generation resources"); *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009) (upholding FERC's approval of capacity requirements because they do not interfere with the right of "[s]tate and municipal authorities . . . to require retirement of existing generators," to prefer "environmentally friendly units," or "to take any other action in their role as regulators of generation facilities without direct interference from the Commission").

The wider statutory context reinforces Section 202(c)'s tightly limited scope. First, the preceding subsections 202(a) and (b) provide cabined authority (exercised by FERC, rather than the Department) to "direct a public utility . . . to establish physical connection[,] . . . sell energy to or exchange energy" with other persons, under normal, non-emergency conditions. 16 U.S.C. § 824a(a)–(b). Those subsections establish specific standards and procedural requirements for such non-emergency orders. *Id.* Section 202(c) removes many of those requirements—but does so only during wartime or similarly extreme circumstances. *Id.* § 824a(c); *see Otter Tail Power Co. v. Fed. Power Comm'n*, 429 F.2d 232, 234 (8th Cir. 1970) (holding that Section 202(c) "enables the Commission to react to a war or national disaster," while Section 202(b) "applies to a crisis which is likely to develop in the foreseeable

---

[6] While Congress amended Section 202(c) in 2015, it did not alter the Department's basic grant of emergency authority; it only addressed occasions on which a Department order might produce a conflict with other laws. *See* H.R. Rep. No. 114-357 (2015).

future"). That structure establishes a clear divide between quotidian energy-system management (even where necessary to avert a non-imminent shortage) governed by Section 202(b), and unusual, unforeseeable emergencies governed by Section 202(c).

Second, Section 215 of the Federal Power Act, added in 2005, separately addresses non-imminent reliability planning: It provides for federal reliability standards subject to discrete procedures and timeframes, and with specified enforcement mechanisms. *See generally* 16 U.S.C. § 824o. As the D.C. Circuit has recognized, the portion of the Federal Power Act that predates that section—which includes Section 202(c)—did not provide the federal government with the power to enforce requirements designed to ensure broad, long-term reliability. *Alcoa Inc. v. FERC,* 564 F.3d 1342, 1344 (D.C. Cir. 2009) (noting that prior to the Energy Policy Act of 2005, "the reliability of the nation's bulk-power system depended on participants' voluntary compliance with industry standards"). Congress added a comprehensive scheme, in Section 215, including separate and tightly cabined procedures to address non-imminent reliability concerns; that scheme precludes expanding Section 202(c)'s "emergency" authority to encompass those same concerns. S*ee FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000) (noting that when interpreting broad statutory terms, courts should be particularly attentive to whether "Congress has spoken subsequently and more specifically to the topic at hand"). Reading Section 202(c) to provide such authority would bypass the limits and procedures that Congress enacted in Section 215; upset the careful balance that section strikes between federal, state, and private power; and override Congress' calibrated choice of enforcement mechanisms. *See Cal. Indep. Sys. Op. Corp. v. FERC*, 372 F.3d 395, 401–02 (D.C. Cir. 2004) ("Congress's specific and limited enumeration of [agency] power" over a particular matter in one section of the Federal Power Act "is strong evidence that [separate section] confers no such authority on [agency].").

The Department's longstanding regulations to implement Section 202(c) confirm those textual and contextual limitations. They define an "emergency" as "an unexpected inadequate supply of electric energy" resulting from "the unexpected outage or breakdown of facilities," which may result from "weather conditions, acts of God, or unforeseen occurrences not reasonably within the power of the affected 'entity' to prevent." 10 C.F.R. § 205.371. Anticipated customer demand can be an emergency only upon "a *sudden* increase" in such demand. *Id.* (emphasis added); 46 Fed. Reg. at 39,985–86 (stating that the regulation defines "emergency" such that the Department may provide "assistance [to a utility] during a period of unexpected inadequate supply of electricity," but cannot "solve long-term problems"). Those examples reflect the limited nature of the emergencies encompassed by Section 202(c): unusual, unforeseen, and unexpected events, with immediate and substantial consequences. The Department's implementing regulations further confirm that Section 202(c) does not permit the Department to use "emergency" orders to commandeer long-term planning: That "a shortage of electric energy is projected" to result from economic factors, or utility decision-making, is not an

emergency absent an "*imminent*" "inability to supply electric service." 10 C.F.R. § 205.371 (emphasis added). They confirm that Section 202(c) authorizes orders "meeting a *specific* inadequate power supply situation"—it does not allow the Department to act merely because it believes that other parties have undertaken "inadequate planning." *Id.* (emphasis added). And the regulations recognize that inadequate energy supply can form the basis of an emergency only where existing resources are "unable to meet . . . *normal* peak load requirements"—not where they merely fall short of extreme or abnormal projections—and only where those requirements cannot be met through "use of all . . . otherwise available resources." 10 C.F.R. § 205.375 (emphasis added).

### 2.  *There Is No Factual Basis Supporting the Department's Order.*

The Department's determination that an emergency exists "is based on" a purported "insufficiency of dispatchable capacity" to meet "anticipated demand during the summer months." Ex. 1 at 2 (DOE Campbell Order). But none of the facts or materials it relies on indicate that a present or imminent emergency exists. Indeed, the Department's own justification does not assert that there is a present or imminent emergency, only "potential tight reserve margins" or an "elevated risk of operating reserve shortfalls." *Id.* at 1. The Order expresses concern about plant closures in Michigan and the potential temporary unavailability of the Palisades nuclear power plant, and cites to MISO's discussion of its Planning Auction results for Planning Year 2025–2026 and a NERC 2025 Summer Assessment that identifies MISO as facing an "elevated risk"—but none of these references describe factual circumstances that come close to meeting the narrow definition of "emergency" that permits Departmental action under Section 202(c). 16 U.S.C. § 824a(c)(1). As a result, the Department fails to justify its emergency determination.

As the following sections explain, the Department has misrepresented the reports on which it relies, for a few reasons: i) Both Consumers and Michigan have prepared diligently for the retirement of Campbell such that its long-planned retirement is not remotely likely to impact the state's resource adequacy; ii) MISO has already determined that its grid will be secure this summer presupposing Campbell's planned retirement; and iii) NERC's 2025 Summer Assessment does not undermine any of those determinations. To the extent the Department's vague references were intended to refer to longer-term planning issues, those would be well outside both the stated justification for this Order, and Section 202(c)'s ambit more broadly. Thus, there is no factual or legal basis for the Department's emergency declaration.

### i.  *Michigan's Stewardship of Grid Security has Already Ensured that the Campbell Retirement Will Not Disrupt Michigan's Grid.*

As explained above, nothing about the process Consumers and Michigan followed to evaluate, plan for, approve, and ultimately implement the retirement of

Campbell and its replacement with sufficient resources to maintain resource adequacy provides any factual support for the Department's emergency declaration here. Consumers and Michigan regulators have been planning for the retirement of Campbell, as well as other recent retirements cited in the Order, for years. *See supra* sections III.B.2, III.C.1, III.C.3–.4. These plans reflect the 2022 Settlement, approved by the Michigan Commission, to which many of the Public Interest Organizations are a party and which set the May 31, 2025, retirement date for the plant. *See supra* section III.C.1. Michigan has been running annual assessments of its resource adequacy to ensure that no part of its system is threatened by recent and planned retirements. *See supra* sections III.B.2, III.C.4. And MISO conducted a local reliability assessment to ensure Campbell's retirement does not even destabilize a smaller load pocket on the system. *See supra* section III.C.2. Nothing about Campbell's planned retirement was unexpected, and nobody was unprepared.

More broadly speaking, individual generator retirements simply cannot, of themselves, demonstrate a resource shortfall: they must be paired with some demonstration that those responsible for maintaining resource adequacy failed to anticipate and, if necessary, compensate for such retirements. Indeed, generators shut down on a regular basis, just as new generators open on a regular basis. As long as those responsible for the system account for those retirements (as occurred here) and ensure that system resources remain adequate, there is no basis to cite the retirement of any particular facility as evidence of an emergency on the grid. Consumers and Michigan have both provided extensive assurances of resource adequacy here; the Order fails to provide any basis to conclude that there have been any "unforeseen occurrences," or any "inadequate planning" that is expected to produce an emergency from the cited retirements. 10 C.F.R. § 205.371.

### ii. *MISO's Stewardship of Grid Security Across its Region has Already Ensured that It Will Not Experience an "Electricity Supply Shortfall" in Summer 2025.*

MISO's multilayered resource adequacy protections have also ensured that no emergency exists within the meaning of Section 202(c). As described above, MISO followed exactly the same resource adequacy protocol for Summer 2025 as it has for over a decade, beginning with the operation of a comprehensive LOLE model analysis to identify a target Reserve Margin of 7.9%. *See supra* section III.B.1.i After developing the regional Reserve Margin for the summer, MISO then converted it to Reserve Margin Requirements based on the Zones' individual load projections, and conducted the 2025–26 Planning Auction to secure the resources necessary to meet those Reserve Margin Requirements. *See supra* section III.B.1.ii. And the results of MISO's Planning Auction for Summer 2025, published this past April, show that MISO did not just meet its 7.9% Reserve Margin, which would have meant procuring 135.2 GW of capacity across its system. Through operation of its new sloped demand curve, MISO secured an additional 2.3 GW of capacity *beyond* what it initially targeted, thereby achieving a 9.8% Reserve Margin, almost 2%

more than the 7.9% it concluded was needed to keep the grid stable. *See supra* section III.C.5. This Planning Auction was the first to procure more capacity than was needed, so MISO has actually taken *more* steps to ensure the stability of its grid for Summer 2025 than in any previous year. Ex. 31 at 5 (MISO 2025–26 Auction Results).

To the extent the Order's emergency declaration relies on an alleged shortfall in Michigan specifically, the Planning Auction results in Zone 7, which encompasses the lower peninsula of Michigan, belie any such shortfall. As explained above, Zone 7 cleared well in excess of its Local Clearing Requirement, which is the level of resources located within Zone 7 that are necessary, in conjunction with existing transmission ties to the rest of MISO, to ensure resource adequacy. In other words, Zone 7 had more than adequate resources to meet its needs through a combination of locally sourced generation and readily available out-of-Zone assets.

Further confirming those determinations of resource adequacy, just this month, in testimony before FERC during the Commissioner-led Technical Conference Regarding the Challenge of Resource Adequacy in RTO and ISO Regions, MISO's representative testified that no capacity deficits have materialized in 2025. *See generally* Ex. 34 (Ramey MISO Comments). Similar testimony came from David Patton, the Independent Market Monitor for MISO, whose job it is to scrutinize the performance of MISO's markets and related procedures for efficiency and efficacy. In his testimony, Dr. Patton emphasized that "MISO is *more than* adequate moving into the Summer of 2025, and [he does] not have substantial concerns about the MISO region in the near term." Ex. 35 at 2 (Patton MISO Comments). This testimony provides further evidence disproving the existence of a resource adequacy emergency within the meaning of Section 202(c).

To reach a contrary result, the Order includes two citations to MISO's 2025–26 Planning Auction results, apparently as evidence of a resource adequacy "emergency" in the MISO region. Ex. 1 at 2 (DOE Campbell Order). But both of these citations rest on a fundamental mischaracterization of the nature and purpose of the Planning Auction and MISO's discussion of its results. First, the Order quotes MISO for the proposition that "new capacity additions were insufficient to offset the negative impacts of decreased accreditation, suspensions/retirements and external resources," *id.*—but in making this observation, MISO was in no way suggesting that there were insufficient resources to achieve resource adequacy in Summer 2025. MISO was simply explaining why the total accredited volume of resources that bid into the Planning Auction went down slightly from 2024 to 2025. Ex. 31 at 13 (MISO 2025–26 Auction Results). Indeed, the charts directly below this quotation and on the next page show that 137.8 GW of accredited capacity were available; and the chart on page 18 shows that only 135.2 MW were needed to achieve MISO's resource adequacy goals (although, as highlighted above, more were actually procured by operation of MISO's sloped demand curve). *Id.* at 13–14, 18. In

31

other words, the MISO system will be even more secure in Summer 2025 than the industry standard.

Meanwhile, the Order's quotation of MISO for the proposition that the summer season's "highest risk and . . . tighter supply–demand balance" "reinforce the need to increase capacity" is truncated: MISO was referring to a need to increase capacity "as demand is expected to grow with new large load additions." *Id.* at 2. This need can only realistically arise after Summer 2025; any large load additions coming online by this summer were included in the Zones' load projections for the Planning Auction. This is a crucial distinction because the entire basis for the Department's declaration of an emergency is, and only ever could be, near-term resource adequacy shortfalls. It is therefore clear that the Department's citations to MISO's Planning Auction do not indicate that an emergency exists within the meaning of the Federal Power Act Section 202(c).

The Department cannot arbitrarily invent an emergency. Yet, its reliance on MISO Planning Auction results and other statements is inapposite: MISO has made clear time and again that the vast region over which it has balancing authority is resource adequate for Summer 2025. This means that MISO is not facing any imminent shortage that might justify an emergency declaration within the meaning of Section 202(c).

### iii. NERC's Identification of an "Elevated Risk" for MISO Does Not Support a Finding of an Emergency under Section 202(c).

The final citation the Department relies on to support its assertion that an emergency supposedly exists in the MISO region comes from the North American Electric Reliability Corporation's ("NERC") 2025 Summer Reliability Assessment. Specifically, the Department emphasizes NERC's conclusion that "MISO is at elevated risk of operating reserve shortfalls during periods of high demand or low resource output." Ex. 1 at 1 (DOE Campbell Order) (*citing* Ex. 41 at 16 (NERC 2025 Summer Reliability Assessment)). Once again, the Department's reliance on this Assessment is based on a foundational mischaracterization of its nature, purpose, and conclusions.

First, the NERC Assessment does not serve the purpose the Department seems to believe. The purpose of the NERC Assessment is to identify and point out to grid operators such as MISO constraints that might arise and implicate grid reliability if not mitigated appropriately. Ex. 41 at 4 (stating that the report "is intended to inform industry leaders, planners, operators, and regulatory bodies so that they are better prepared to take necessary actions to ensure [bulk power system] reliability."). This means the events flagged by NERC are not necessarily grid emergencies; they are periods of time in which MISO might need to take certain mitigation measures to maintain grid security. Crucially, the types of mitigation measures NERC endorses are readily available to MISO; they do not come close to

the extreme measures the Order demands. The Assessment's recommendations include "[r]eview[ing] seasonal operating plans and protocols for communicating and resolving potential supply shortfalls," including the "potential for higher-than-anticipated forced generator outage rates" in operating plants; entering into "conservative operations" earlier and better coordinating generator outages; and "prepar[ing] for efficient implementation of demand-side management mechanisms." *Id.* at 8. This list of interventions focuses on operational preparedness rather than resource manipulation as the most viable pathway to ensuring grid stability even in extreme scenarios; notably absent from this list of recommendations is a suggestion to interfere with previously established resource management decisions.

Second, and consistent with its foundational purpose, NERC's Assessment designates "load-modifying resources" (*i.e.*, demand response reserve resources) and "energy transfers from neighboring systems" as "operating mitigations" available to MISO rather than as "anticipated" (available) resources. *Id.* at 16; *see also* 10 C.F.R. § 205.375 ("A system may be considered to have an inadequate . . . energy supply capability when" "it is unable to meet normal peak load requirements based upon use of *all of its otherwise available resources* . . . .") (emphasis added).[7] This is consistent with the NERC Assessment—using both resource types requires advanced planning and preparedness by MISO—but it underscores the Department's misunderstanding when it cites to NERC's classification scheme without acknowledging that "risks" identified by NERC can easily be "mitigated" by these two crucial categories of resources. In other words, the "elevated risk" identified in NERC's assessment is *not* one of a grid emergency; it is instead a risk of an event that MISO could mitigate by accessing a suite of demand response resources and imports of power from neighboring regions to keep the grid operating smoothly.

The possibility that MISO might ask backup demand response resources to activate is not an "emergency" within the meaning of Section 202(c) because that is the point of such resources: they offer to curtail their use of power on demand in exchange for hefty payments. Instead, it is indicative of routine analysis and planning. Similarly, MISO's operational planning metrics already presume that most grid-straining events can be reduced or eliminated by importing large quantities of power from neighboring regions, even without firm import

---

[7] The Department must incorporate demand response and other alternatives in determining whether an emergency exists, and as a condition precedent to circumstances calling for generation by a polluting resource like Campbell, a requirement consistent with Departmental practice. *See* 16 U.S.C. § 824a(c)(1)–(2); 10 C.F.R. § 205.375; *e.g.*, Ex. 39 at 4–5 (DOE Order No. 202-22-2); Ex. 45 at 2–3 (DOE Order No. 202-21-1); Ex. 17 at 3 (DOE Order No. 202-20-2).

commitments (*i.e.*, from resources that have committed in MISO's Planning Auction to principally serve MISO's load). Any "event" identified by NERC can already be addressed by the large number of transmission interconnections between MISO and its neighboring regions.

Indeed, MISO's ability to import power, both into Michigan and into its broader footprint, is one of the key resources it relies on to alleviate grid constraints. For the entire period of the Order, Zone 7 can import around 3,600 MW. Ex. 37 at 13 (MISO 2025–2026 CIL/CEL Final Results). And the MISO territory's transmission connectivity with its neighbors gives MISO approximately 24 GW of import capability[8] from other regions that, according to the NERC Assessment, are not even facing "elevated risk" this summer, including PJM, TVA, SERC, Ontario, and Manitoba. Ex. 41 at 6, fig.1 (NERC 2025 Summer Reliability Assessment); Ex. 66 at 22–35 (NERC 2024 Interregional Transfer Capability Study, Part 1). MISO has an additional almost 5 GW of import capability from SPP. *Id.* And that capability is very relevant: regions import and export power from and to neighbors on a regular basis to alleviate grid constraints—as anticipated and encouraged by Section 202(a). *See, e.g.*, Ex. 43 at § III.A.3.b (Winter Storm Elliott System Operations Inquiry) ("Despite tightening conditions on the MISO system . . . MISO maintained steadily increasing exports to TVA throughout the day."); Ex. 44 at 43 (PJM Elliott Report) (describing PJM exports of between 8 and 11 GW to TVA and other neighboring regions), 83–84 (describing PJM power exports to MISO and graphically depicting those exports over time); Ex. 36 at 6 (MISO Elliott Max. Gen. Event Overview) ("MISO consistently exported power to southern neighbors with a maximum value of nearly 5 GW."). These examples underscore that the "elevated risk" identified in the NERC assessment describes the possibility of events that MISO already has the tools to address.

Finally, even within the terminology of the Assessment, an "elevated risk" designation does not constitute an emergency because it does not indicate the possibility of imminent shortfalls; indeed, it is only the second of three risk levels offered by NERC. Since it began providing standardized "risk" assessments by region in the summer of 2021, NERC has adhered to a three-tiered assessment of risk: areas facing the least risk are "low" or "normal" risk regions, areas facing the most risk are "high" risk regions, and areas in between are "elevated" risk regions. *See id.* at 6; Ex. 42 at 74, 124, 170, 218 (2019–24 NERC Summer Reliability Assessments); *cf. id.* at 1–32. NERC's determination of "elevated" risk indicates only that there is a "[p]otential for insufficient operating reserves in above-normal conditions." Ex. 41 at 6 (NERC 2025 Summer Reliability Assessment). In other

_____

[8] This figure is subject to downward revisions due to the dynamics of maintaining voltage, frequency, thermal stability, and other operational issues associated with the transmission grid.

words, the only circumstances in which NERC even identifies the *possibility* of shortfalls are scenarios in which conditions that NERC itself identifies as "extreme" due to historically high outage rates among the generation fleet or demand levels that are well above utilities' maximum projections. *Id.* at 16; *see* Ex. 2 at 7–8, 10–11 (Grid Strategies Report). The Department's decision to declare a Section 202(c) emergency based on an eminently remediable shortfall that could only transpire in the first instance during historically extreme weather exceeds its lawful authority, as does its use of Section 202(c) to force a favored generation resource to stay open. *See* 10 C.F.R. § 205.375 ("A system may be considered to have an inadequate . . . energy supply capability when" "it is unable to meet *normal* peak load requirements" (emphasis added)).

The routine nature of NERC's "elevated risk" determinations further undermines the Department's framing of such determinations as "emergencies." In four of the past five years, NERC has assessed MISO as an "elevated" risk region; and in 2022, it identified MISO as a "high" risk region. *Id.* These "elevated" risk determinations are not unique to MISO: Texas's ERCOT region has been identified as an "elevated" risk region each of the past five years, and three other regions[9] have been classified as elevated or high risk in four of the past five years. *Id.* Crucially, in none of these summers, including the summer of 2022, was MISO forced to actually shed load as a result of a resource adequacy shortfall.[10] *See* Ex. 32 (MISO Emergency Declarations) (demonstrating that MISO has not faced a Market Footprint Maximum Generation Emergency Event Step of 3 or higher from 2009 to 2024); Ex. 33 at 9–26 (MISO Market Capacity Emergency) (describing Max Gen Emergency Event procedures, which only include shedding of unwilling load at Event Step 5). Thus, the NERC 2025 Summer Assessment does not provide the Department with a statutory basis for a Summer 2025 MISO emergency determination.

***

The statute only permits the Department to act in the face of an imminent, exigent, short-term supply shortfall. The Order is not based on any such shortfall

---

[9] These three regions roughly correspond to California (WECC-CA/MX), Arizona and New Mexico (WECC-Southwest), and New England (NPCC-New England).

[10] As Ex. 33 reveals, MISO establishes a ten-step process for addressing what it describes as a "Max Gen Emergency": for the first nine steps of this process ("1a" through "4b"), an increasing list of mitigation measures is deployed, including requesting power transfers from neighboring regions, turning on backup generators, utilizing contracted demand response resources, and asking the public for voluntary reductions. Only on the final step ("5") does any involuntary load shedding occur. *See also* Ex. 2 at 6–7 (discussing tools MISO can employ in stepwise fashion).

that is, or could be, supported by substantial evidence. Both Michigan and MISO have confirmed that the retirement of the plant creates no reliability concerns, in the near-term or otherwise. The materials cited by the Order do not provide any meaningful basis to contradict those well-supported conclusions. As a result, the Order violates the law.

B.  *Even if There Were a Short-Term Need—Which There is Not—the Order Does Not Comply with the Statutory Command to Set Terms that Best Meet the Emergency and Serve the Public Interest.*

1.  *Section 202(c)(1) Only Authorizes the Department to Require Generation that Best Meets the Emergency and Serves the Public Interest.*

Section 202(c)(1) demands the Department only impose requirements that (i) "best" (ii) "meet the emergency and" (iii) "serve the public interest." 16 U.S.C. § 824a(c)(1).

The term "best" demands a comparative judgment that there are no better alternatives. The word "best" is inherently a comparative term and means "that which is 'most advantageous.'" *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (*quoting* Webster's New International Dictionary 258 (2d ed.1953)); *cf. Sierra Club v. Env't. Prot. Agency*, 353 F.3d 976, 980, 983–84 (D.C. Cir. 2004) (explaining that statutory "best available control technology" requirement demands sources in a category clean up emissions to the level that peers have shown can be achieved). Consequently, the Department must, at minimum, consider alternatives and evaluate whether and to what extent a given alternative addresses the emergency and serves the public interest, including deficiencies associated with the alternative.

And as part of exercising reasoned decision-making, the Department must consider alternatives. It need not consider every conceivable alternative, but it must consider alternatives within the ambit of the existing policy as well as alternatives which are significant and viable or obvious. *See Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020); *Motor Vehicle Manufs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013). Intervenors and the public may also introduce information that requires the Department to evaluate alternatives and reconsider its decision to impose or maintain a requirement. *See, e.g.*, *Chamber of Com. of the U.S. v. Secs. & Exch. Comm'n*, 412 F.3d 133, 144 (D.C. Cir. 2005) (evaluating agency failure to consider alternative raised by dissenting Commissioners and introduced by commenters); *cf.* 10 C.F.R. § 205.370 (stating ability to cancel, modify, or otherwise change an order).

To be sure, the nature and extent to which the Department must consider alternatives depends on the emergency. An emergency that truly requires the

Department to act within hours, for instance, permits a more abbreviated consideration than an emergency for which the Department has days to decide.

The Department's regulations and practice identify relevant alternatives for its consideration. The regulations specify information the Department shall consider in deciding to issue an order under Section 202(c), and require an applicant for a 202(c) order to provide the information. 10 C.F.R. § 205.373. The specified information includes "conservation or load reduction actions," "efforts . . . to obtain additional power through voluntary means," and "available imports, demand response, and identified behind-the-meter generation resources selected to minimize an increase in emissions." 10 C.F.R. § 205.373(g)–(h); Ex. 5 at 5 (DOE Order No. 202-22-4).

The Department may then only choose the best alternative. The best alternative is the one which is most advantageous for meeting the stated emergency and serving the public interest.

The statutory command to take only measures that serve the public interest, including with respect to environmental considerations, further constrains the Department's authority. The public interest element demands that the Department advance, or at least consider, the various policies of the Federal Power Act. *Cf. Wabash Valley Power Ass'n*, 268 F.3d at 1115 (interpreting the "consistent with the public interest" standard in Section 203 of the Federal Power Act); *see Gulf States Utils. Co. v. Fed. Power Comm'n*, 411 U.S. 747, 759 (1973); *California v. Fed. Power Comm'n*, 369 U.S. 482, 484–86, 488 (1962). Primary policies of the Federal Power Act include protecting consumers against excessive prices; maintaining competition to the maximum extent possible consistent with the public interest; and encouraging the orderly development of plentiful supplies of electricity at reasonable prices. *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 670 (1976) (orderly development); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374 (1973) (maintaining competition); *Pa. Water & Power Co. v. Fed. Power Comm'n*, 343 U.S. 414, 418 (1952) (excessive prices). And because Section 202(c) expressly protects environmental considerations, these are part of the public interest element too. See *NAACP*, 425 U.S. at 669 ("[T]he words 'public interest' . . . . take meaning from the purposes of the regulatory legislation.").

### 2. *The Order Fails to Impose Requirements that Best Meet the Claimed Emergency and Serve the Public Interest.*

The Order determines that additional dispatch of Campbell is necessary to best meet the emergency and serve the public interest. But the Order provides no rational basis for that determination. The Order does not address the Campbell Plant's limitations or explain how, in light of those limitations, it could even meet the claimed emergency. In fact, Campbell is unlikely to be able to do so. The Order does not examine the expense of running Campbell or its environmental damage,

relevant factors which cause additional dispatch of the plant to harm, rather than serve, the public interest. And the Order does not address readily available and obvious alternatives which, in point of fact, would better compensate for the "insufficiency of dispatchable capacity" asserted (inaccurately) by the Order. Ex. 1 at 2 (DOE Campbell Order). Consequently, the Order is without support in the record and unlawful. *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998); *State Farm*, 463 U.S. at 42–43, 51.

Campbell's age, exacerbated by the last several years spent planning for its retirement, raises significant doubt that Campbell is capable of reliable operation such that it could meet the claimed emergency. Even before the planned retirement in May 2025, the Campbell plant suffered from poor reliability. Ex. 3 at 4 (Powers Decl.). In 2024, the forced outage rate for the units was approximately 15 percent (Unit 1), 48 percent (Unit 2), and 19 percent (Unit 3); in 2023, it was approximately 19 percent (Unit 1), 57 percent (Unit 2), and 22 percent (Unit 3). *Id.* (*citing* exhibits to Consumers' witness Hoffman's 2024 and 2025 testimonies). Across all units, these rates are substantially worse than the national average for coal-fired units of 12 percent. *Id.* (*citing* Ex. 40 (NERC 2024 Reliability Report)).

The nature of the units' outages in 2023 and 2024 "reflects the impact of worn and difficult-to-repair or replace coal unit components on operational reliability." *Id.* at 4. Outages were long and recurrent. For example, in 2023, Unit 2 experienced four outages totaling 3,445 hours—nearly 40 percent of the year—due to a pump failure, and in 2024, Unit 3 experienced an outage totaling 1,104 hours due to a failure in one of the turbine's gears. *Id.* at 5 (citing exhibits to Consumers' witness Hoffman's 2024 and 2025 testimonies). Across the units, thousands of hours of outages occurred in 2023 and 2024 due to failed and degraded parts, which "are the predictable result of old equipment, no capital investment, and minimal maintenance." *Id.* at 4–5.

The precipitous drop-off in investment at Campbell in recent years likely makes the plant even less reliable. In 2024, Consumers' witness Blumenstock testified that "[p]rojects that are targeted to improve reliability will not be considered" for Units 1 and 2 and, for Unit 3, "[c]apital projects that are targeted to improve reliability will not be considered." Ex. 11 at 19, 21 (Blumenstock 2024 Direct Testimony). Consumers' filings with the Michigan Commission show that for 2022 through 2025, the company's capital spending at Campbell Units 1 and 2 and Campbell Unit 3 is 93% and 90% lower, respectively, than what the company projected it would need to spend if it had planned to keep the plant online longer. Ex. 3 at 6 (Powers Decl.). Likewise, the company's major maintenance spending at Campbell Units 1 and 2 and at Campbell Unit 3 is 62% and 78% lower, respectively. *Id.*

Consumers' strategic decision to decrease investment in Campbell means Consumers did not undertake projects that it likely believed were necessary for reliable operation past the planned retirement date, *id.*, consistent with witness

Blumenstock's 2024 testimony that Consumers was not considering projects targeted to improve reliability, Ex. 11 at 19, 21 (Blumenstock 2024 Direct Testimony). For example, one of the projects Consumers cancelled was a $7.9 million Unit 3 turbine overhaul project originally scheduled for 2024. Ex. 3 at 16 (Powers Decl.). If that project had been undertaken before April 2024, it likely could have prevented the 1,104-hour outage at Unit 3 that occurred in late April 2024 due to a turbine gear failure. *Id.*

In addition, information from the Department and Consumers indicate that Campbell's coal supplies were already dwindling, Ex. 2 at 13–14 (Grid Strategies Report), and its employees were already relocating prior to the Order. At a minimum, Campbell's last-second pivot to continued operations, forced by the Order, is inconsistent with the long-term and orderly planning processes that utilities undertake to shore up reliable operations; at worst, it sets the plant up to scramble with inadequate resources if and when the plant is forced to run. As Public Interest Organizations' expert demonstrates with Department data in the chart reproduced below, Consumers depleted its coal stocks as it prepared for retirement. *Id.* at 14; *see also* Ex. 52 (MI State Energy Profile) (stating that "[m]ost of the coal consumed in Michigan comes by rail from the West").



Separately, the Order provides no reasoned basis to conclude that Campbell, even if fully maintained and operational, could meet the claimed emergency. Campbell is not designed to turn on quickly in response to times of extreme demand. In general, coal-fired power plants like Campbell typically take approximately 12 hours to become fully operational. Ex. 3 at 17 (Powers Decl.) (*citing* Ex. 55 (IEA Flexibility Report)). By comparison, "utility-scale battery storage can dispatch from a cold start to full power in a matter of seconds." *Id.* Campbell's long lead time makes it especially unsuitable for any Section 202(c) order: the type of grid emergency contemplated by Section 202(c)'s text and requirement of

imminence would need to be addressed on a timescale that the Campbell plant simply would not be able to start up fast enough to meet—thereby either defeating the purported purpose of keeping the plant operational past its retirement date, or forcing the plant to run constantly in anticipation of such emergencies, which would contravene the limitations set forth in Section 202(c)(2), discussed below. Thus, Campbell is plainly not the best means of meeting the range of energy emergencies MISO might plausibly face, even were there a resource adequacy problem.

The power outage in Louisiana on May 25, 2025, powerfully demonstrates this point, as well as more broadly the need for solutions tailored to particular circumstances. Inadequate transmission connectivity between southeastern Louisiana and neighboring regions prevented the copious availability of generating capability in those other regions from filling the gap that was created when a major nuclear plant had an unplanned outage. Amanda D. Cook, *MISO: New Orleans Area Outages Owed to Scant Gen, Congestion, Heat* (June 9, 2025), https://www.rtoinsider.com/106609-miso-new-orleans-outages-owed-to-scant-gen-congestion-heat. As a result, energy prices in Louisiana exceeded $2000/MWh even as prices in the neighboring Mississippi Delta dropped into the negatives, down to -$400/MWh. *Id.*

Campbell could not address events like the Louisiana outage for two key reasons. First, no additional generation (from Campbell or elsewhere) can supply power to a region that is transmission constrained. Thus, the Louisiana outage demonstrates the futility of solutions not tailored to the problem they are supposedly addressing. Second, by the time Campbell might have initiated operations, electric service had long been restored to the Louisiana customers who experienced blackouts.

Further, the expense of operating Campbell renders it unable to serve the public interest, a topic the Order does not address. As discussed in section III.A.1, Campbell has been, and continues to be, an expensive plant to run. In 2021, Consumers projected that retiring Campbell in 2025 would avoid $365,008,000 in capital expenditures and major maintenance costs. Ex. 13 at 3–4 (Kapala Direct Testimony). Campbell has gotten more expensive to run since then: the cost of Campbell's power was 21% higher in 2021 than in 2024, rising faster than inflation. Ex. 49 (2025 Energy Innovation Dataset); Ex. 50 at 3 (2025 Energy Innovation Coal Cost Report); *see also* Ex. 51 at 12 (2023 Energy Innovation Coal Cost Report).

Bringing Campbell from a cold start condition to full output to meet any claimed emergency would also be extremely expensive. The estimated cost to "cold start" a coal-fired power plant is $417 per MW of capacity. Ex. 3 at 18–19 (Powers Decl.) (*citing* Ex. 54 (NARUC Coal Report)). The total nameplate capacity of Campbell Units 1–3 is 1,561 MW. *Id.* at 18. Therefore, the estimated cost to cold start Campbell at its nameplate capacity is approximately $650,000. *Id.* at 19.

40

Moreover, as discussed above, Consumers has significantly decreased investment in Campbell since the Integrated Resource Plan proceeding that established the plant's May 2025 retirement date, forgoing a long list of capital and maintenance projects totaling approximately $161 million. Ex. 3 at 5–6 (Powers Decl.). As Public Interest Organizations' expert engineer states, "[i]t is reasonable to assume that much of this investment was necessary to ensure continued, nominally reliable operation of Campbell." *Id.* at 16. Consumers itself explains that, "given the ages and designs of the systems, replacement parts are not always readily available. In some instances, replacement parts do not exist at all." *Id.* at 15 (*quoting* Consumers' witness Hoffman's testimony). And as discussed *supra* in section III.A.1, operation of the Campbell plant results in significant environmental pollution. Thus, even accepting *arguendo* that an emergency exists and Campbell could address it, the Department still has not met its burden to provide a reasoned basis that the directive best meets the emergency and serves the public interest.

Other alternatives are available to the Department that better meet the claimed emergency and serve the public interest. For instance, Public Interest Organizations have highlighted above the robust transmission connectivity between MISO and neighboring regions, which MISO has accessed on a regular basis to support the stability of its grid. *See supra* section IV.A.2.iii. This is consistent with the Department's long-standing recognition that power pools and utility coordination "are a basic element in resolving electric energy shortages." 46 Fed. Reg. at 39,985–86. However, the Department's citation of the NERC 2025 Summer Assessment, which considers interregional connectivity only as a mitigation option, suggests that the Department does not have full confidence in the availability of this resource. As explained above, the Department offers no reasonable basis to question the availability of resources from neighboring regions. But even if there were some barrier to transmission from those regions, the Department has not (and likely could not) explain why the Order provides a better means of ensuring resource sufficiency than addressing those barriers directly through its power to require "interchange" and "transmission" of electric energy from those neighboring regions. 16 U.S.C. § 824a(c)(1).

Neither the Order nor its supporting memorandum includes any consideration of other alternatives. *See* Ex. 4 (DOE Campbell Memorandum). And the Order contains no reasoning demonstrating why Campbell is the best alternative, or a better alternative than other options, or is even capable of meeting the claimed emergency. As such, the Order is unlawful.

41

3.  *The Order Is Unlawfully Ambiguous, Impermissibly Vague, and Does Not Provide Fair Notice of What MISO, Consumers Energy, and Others Are Required to Do.*

The Order requires MISO and Consumers Energy to "take all measures necessary to ensure that the Campbell Plant is available to operate." Ex. 1 at 2 (DOE Campbell Order). The Order further requires MISO to "take every step to employ economic dispatch of the Campbell Plant to minimize cost to ratepayers." *Id.* Those requirements are unlawfully susceptible of multiple meanings and lack necessary precision.

The availability requirement is impermissibly ambiguous and vague. The Order does not explain, for instance, whether it requires (a) only that MISO and Consumers Energy take measures so they are ready to send, receive, and respond to dispatch instructions to the extent capable with no other actions, or (b) that MISO and Consumers Energy take additional measures that enlarge their capabilities to operate (like capital investments). The Order also does not define the Campbell Plant, *see* Order at *passim*, so it is unclear whether MISO and Consumers Energy are required to take measures to ensure that each of the three units at the plant are equally "available to operate." *Id.* at 2.

The economic dispatch requirement is also impermissibly ambiguous and vague (in addition to being unlawful as discussed *infra* in section IV.D). The MISO Tariff contains provisions governing economic dispatch, *see generally* MISO's FERC-Approved Tariff at Module C & Schedules 29, 29A, *available at* https://etariff.ferc.gov/TariffBrowser.aspx?tid=1162, but those provisions generally depend on offer submissions from market participants containing a variety of parameters, *see, e.g.*, MISO, *Business Practices Manual: Energy and Operating Reserve Markets* § 4.2 (effective Sept. 30, 2024) (discussing resource offer requirements). The Order does not specify whether Consumers Energy is required to submit offers and, if so, the extent to which the utility has discretion either in the price and parameters of those offers or in the markets to which the offers are submitted. If Consumers is not required to submit offers, the Order does not specify whether MISO is required to adjudge when economic dispatch calls for dispatch of the plant, and if so on what basis.

Additionally, the Order's reference to "ratepayers" is impermissibly ambiguous and vague. For instance, does the Order refer to ratepayers in the MISO wholesale energy markets, the MISO capacity market and ancillary services markets, bilateral markets, retail ratepayers, some combination of these ratepayers, or some other set of ratepayers? The Order also contains no geographic limit on the referenced ratepayers, such that it is not clear whether MISO is directed to minimize cost to ratepayers in Michigan, across MISO, or some other area. It further contains no temporal limit, such that it is unclear whether MISO is directed to minimize cost to current ratepayers, future ratepayers, or both. Moreover, the

Order contains no standards or guidance on how MISO is to reconcile or balance countervailing tensions, like minimization of costs to current and future ratepayers.

The above defects are fatal to the Order's validity. A reasonably prudent person—regardless of whether such person is familiar with the electric industry—cannot ascertain the Order's meaning. MISO and Consumers are left in the dark as to what they are required to do. The ambiguities also make unclear the scope of activities and omissions coming within the effect of Section 202(c)(3), leaving the public and Public Interest Organizations in the dark as to what pollution is and is not allowed. As such, the Order does not give fair notice of conduct that is forbidden or required, and it is therefore unlawful. *Fed. Commc'ns Comm'n v. Fox Telev. Stations, Inc.*, 567 U.S. 239, 253 (2012); *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

In addition, the ambiguities and vagaries leave open such a wide variety of actions and interpretations by MISO and Consumers that the Department fails to state in the Order its judgment as to the requirement that will best meet the emergency and serve the public interest. As such, the Department fails to comply with Section 202(c)(1) and the Order is consequently arbitrary and capricious, an abuse of discretion, not in accordance with law, and beyond the Department's statutory authority. *Cf. Allentown Mack*, 522 U.S. at 375.

Also, the Department orders "relevant governmental authorities" to take action and make accommodations. Ex. 1 at 3 (DOE Campbell Order). This is vague, ambiguous, arbitrary, and beyond the Department's authority under Section 202(c). The Order does not identify which governmental entities, if any, are covered by the directive. Moreover, the Department does not have authority under Section 202(c) to issue directives to governmental authorities. 16 U.S.C. § 824a(c)(1).

## C. The Order's Availability Requirements Exceed the Department's Statutory Authority.

In directing MISO and Consumers Energy to take "all measures" to ensure that the Campbell Plant is "available to operate," Ex. 1 at 2 (DOE Campbell Order), the Department exceeded its authority under Section 202(c) of the Federal Power Act and impermissibly intruded on the authority over generating facilities that Section 201(b) of the statute reserves to the states, 16 U.S.C. §§ 824(b)(1), 824a(c)(1). The sweeping language in the Department's Order would encompass physical and all other changes necessary to revive a generating plant that is being closed pursuant to a state-approved closure process. The Federal Power Act's language, structure, legislative history, and interpretation by the courts all confirm that the Department's Order is unlawful.

The structure and language of the Federal Power Act reflect Congress's deliberate choices to preserve the states' traditional authority over generating

43

facilities and to circumscribe the Department's emergency authority in light of the states' role. The first sentence of the Federal Power Act declares that federal regulation extends "only to those matters which are not subject to regulation by the States." *Id.* § 824(a). Section 201(b)(1) states that, except as otherwise "specifically" provided, federal jurisdiction does not attach to "facilities used for the generation of electric energy." *Id.* § 824(b)(1). The courts have held that Section 201(b)(1) reserves to the states authority over electric generating facilities, *see, e.g., Hughes*, 578 U.S. at 155, including the authority to order their closure, *Conn. Dep't of Pub. Util. Control*, 569 F.3d at 481 (under Section 201(b), states retain the right "to require the retirement of existing generators" or to take any other action in their "role as regulators of generation facilities."). Congress also recognized the states' exclusive authority over generating facilities in Section 202(b), which provides that FERC's interconnection authority does not include the power to "compel the enlargement of generating facilities for such purposes." 16 U.S.C. § 824a(b).

There is a clear distinction between authority to regulate generation facilities and the Department's authority under Section 202(c) to require generation of electric energy. Electric energy is an electromagnetic wave, and its "generation, delivery, interchange, and transmission" is the creation and propagation of that wave. *See* Brief *Amicus Curiae* of Electrical Engineers, Energy Economists and Physicists in Support of Respondents at 2, *New York v. FERC*, 535 U.S. 1 (2002); *see also* Edison Electric Institute Glossary of Electric Utility Terms (1991 ed.) (defining electric generation as "the act or process of transforming other forms of energy into electric energy"). Section 202(c)(1), like the rest of the Federal Power Act, is written "in the technical language of the electric art" and federal jurisdiction generally "follow[s] the flow of electric energy, an engineering and scientific, rather than a legalistic or governmental test." *Conn. Light & Power v. Fed. Power Comm'n*, 324 U.S. 515, 529 (1945); *see also Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453, 454, 467 (1972).

The scope of the Department's emergency power under Section 202(c) is bounded both by the provision's specific language and Congress's clear intention and repeated direction in the Federal Power Act to respect the states' authority over generating facilities. When an actual emergency exists, Section 202(c)(1) authorizes the Department to require just two specific things: (1) "temporary connections of facilities" and (2) "generation, delivery, interchange, or transmission of electric energy." *Id.* § 824a(c)(1). The only reference to "facilities" in the authorizing provision of Section 202(c)(1) appears in the clause relating to temporary connections, not in the clause pertaining to "generation" of electric energy. And that clause only authorizes connections "of" facilities; it does not provide authority to regulate the facilities. The differences in Congress's word choice in these clauses— referencing "facilities" in one authorizing provision but not the other–must be given effect. *See, e.g., Gallardo v. Marstiller*, 596 U.S. 420, 430 (2022); *Gomez-Perez v. Potter*, 553 U.S. 474, 486 (2008).

44

Given Congress's use of the term "generating facilities" elsewhere in the statute, if it had intended to give the Department authority over generating facilities in Section 202(c)(1), it would have done so explicitly. Instead, the provision conspicuously excludes authority to manage the physical characteristics of power plants. Congress purposely limited and particularized the Department's emergency powers, carefully avoiding intrusion on the states' authority over generating facilities recognized in Section 201(b)(1). *See* S. Rep. No. 74-621, at 19 (explaining that the emergency powers in Section 202(c)(1) "which were indefinite in the original bill have been spelled out with particularity"); *compare* S. 1725, Cong. Tit. II § 203(a) (providing in original, unenacted bill that control of the production and transmission of electric energy "except in time of war or other emergency declared to exist by proclamation of the President, shall, as far as practicable, be by voluntary coordination"), *with* 16 U.S.C. § 824a(c)(1) (providing particularized, specific authorities and circumstances in which the authorities may be exercised).

The Department may require generation of electric power, and a utility may properly take steps at the facility to produce the power. It is commonplace in the electric sector for the federal regulator properly acting within its authority to cause effects in a state regulator's jurisdictional sphere, and vice versa. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 281 (2016). But the federal regulator may neither directly regulate generation facilities nor impose requirements aimed at the facilities, even if nominally regulating within its sphere. *See id.* at 281–82; see also *Hughes*, 578 U.S. at 164–65. Such encroachment is impermissible, even in a real emergency or in a wrongly claimed one. *See Conn. Light & Power*, 324 U.S. at 530 ("Congress is acutely aware of the existence and vitality of these state governments. It sometimes is moved to respect state rights and local institutions even when some degree of efficiency of a federal plan is thereby sacrificed."). Thus, the Department may not require generation which necessitates the utility taking steps reserved to state authority, such as building a new generating unit or refurbishing a broken one.

Congress did not give the Department sweeping authority to order "all measures" needed to make a generation facility "available to operate." *See* Ex. 1 at 2 (DOE Campbell Order). Nowhere does the statute empower the Department to order "all" steps that may be needed to resuscitate the Campbell Plant, which could include repairs or modifications to physical facilities and other measures going far beyond electric power generation. Because the plant is at the end of its useful life, with years of forgone maintenance and investment, rendering it capable of meeting a short-term supply shortfall could essentially require rebuilding significant parts of the plant. On its face, the Department's Order is *ultra vires*. The Order also contravenes Congress's repeated direction in the Federal Power Act to respect the states' authority over generating facilities, which includes the authority that

Michigan exercised to approve the Campbell Plant's closure. The Order therefore is unlawful and should be withdrawn.[11]

### D. *The Order Fails to Provide the Conditions Necessary to Override Environmental Standards Under Section 202(c)(2).*

The Order purports to authorize operations that may "conflict with environmental standards and requirements." Ex. 1 at 2 (DOE Campbell Order). Where an order may produce such a conflict, Section 202(c)(2) requires the Department to "ensure:" (1) that it compels "generation, delivery, interchange, or transmission of electric energy only during hours necessary to meet the emergency and serve the public interest;" (2) that operations are "to the maximum extent practicable . . . consistent with any applicable Federal, State or local environmental laws;" and (3) that it minimizes any adverse environmental impact, regardless of the facility's compliance (or non-compliance) with environmental standards. 16 U.S.C § 824c(c)(2). The Order here violates all three of those statutory obligations— a failure with especially severe consequences given the pollution produced by the Campbell Plant.

#### 1. *The Order Lacks the Conditions Required by* Section 202(c)(2).

First, the Order directly contradicts the Department's obligation to require generation "only during hours necessary to meet the emergency." *Id.* The Order instead states: "For the duration of this order, MISO is directed to take every step to employ *economic dispatch* of the Campbell Plant to *minimize cost* to ratepayers." Ex. 1 at 2 (DOE Campbell Order) (emphasis added). The "emergency" nominally described by the Order is "the potential loss of power to homes and local businesses in the areas that may be affected by curtailments or outages," during the upcoming summer. *Id.* Even if the Department had substantiated that emergency (which it has not) the Act would allow the Department to compel generation only when such losses would occur absent operation of the Campbell Plant. 16 U.S.C. 824a(c)(2); *see, e.g.*, Ex. 6 at 9 (DOE Order No. 202-17-4 Summary of Findings) ("authorizing operation of" units subject to emergency order "only when called upon . . . for reliability purposes," according to "dispatch methodology" approved by Department). "Economic dispatch," in sharp contrast, requires "the lowest-cost resources [to] run first," in pursuit of "the lowest-cost energy available." *City of New Orleans v. FERC,* 67 F.3d 947, 948–49 (D.C. Cir. 1995)*; see also Fla. Power & Light Co. v. FERC,* 88 F.3d 1239, 1241 (D.C. Cir. 1996) (noting distinction between

---

[11] A utility that takes steps subject to state authority cannot point to a Section 202(c) order as the basis for a right to recover associated costs. *See* 16 U.S.C. § 824a(c)(1) (providing for compensation or reimbursement to be paid based on just and reasonable terms for carrying out an authorized order).

economic dispatch and reserve capacity rules). By directing MISO to dispatch the plant along those cost-based principles, rather than "only during the hours necessary to meet the emergency" forming the basis for its Order, the Department has violated Section 202(c)(2). 16 U.S.C. § 824a(c)(2).[12]

Second, the Order fails to ensure that the Campbell Plant operates, "to the maximum extent practicable," in conformity with applicable environmental rules. *Id.* The Order paraphrases the statutory text—that "operation of the Campbell Plant must comply with applicable environmental requirements . . . to the maximum extent feasible," but fails to specify *who* bears that responsibility or *what* such operation entails. Ex. 1 at 3 (DOE Campbell Order). It imposes no further conditions beyond requiring Consumers Energy to "pay fees or purchase offsets or allowances for emissions." *Id.* The direction to "comply . . . to the maximum extent feasible" is, as a result, wholly unenforceable; the Order provides no basis for the Department, or anyone else, to determine whether the plant is in fact complying or who might face the consequences of any failure to do so. *See* Ex. 5 at 5–6 (DOE Order No. 202-22-4) (requiring, *inter alia,* reporting of "number and actual hours each day" of operation "in excess of permit limits or conditions," and information describing how generators met requirement to comply with environmental requirements to maximum extent feasible). As such, the Order does not meet the Department's statutory obligation to "*ensure*" the maximum feasible compliance with applicable environmental standards. 16 U.S.C. § 824a(c)(2) (emphasis added).

Third, the Order fails to provide any conditions at all to "minimize[] any adverse environmental impacts." 16 U.S.C. § 824a(c)(2). That mandate is textually and substantively distinct from the Department's (also unfulfilled) obligation to ensure maximum practicable compliance with environmental standards. *Id.* The Order fails, most importantly, to include measures that would mitigate impacts when compliance with environmental standards proves impracticable—measures that have been routinely included in past orders. *See, e.g.*, Ex. 6 at 4 (DOE Order No. 202-17-4 Summary of Findings) (permitting non-compliant operation only during specified hours, and requiring exhaustion of "all reasonably and practicably available resources," including available imports, demand response, and identified behind-the-meter generation resources selected to minimize an increase in emissions); Ex. 5 at 7 (DOE Order No. 202-22-4) (requiring "reasonable measures to inform affected communities" of non-compliant operations); Ex. 6 (DOE Order No. 202-17-4 Summary of Findings). At a minimum the statute requires the Department to include sufficiently detailed reporting obligations to ascertain what impacts result from emergency operations; without such reporting, the Department has no ability to "ensure" that adverse impacts are minimized. *See, e.g.*, U.S. Dep't

---

[12] That direction further fails to conform to the statute's command to compel only the generation that will "best meet the emergency." 16 U.S.C. § 824(c)(1).

of Energy, Order No. 202-24-1, at 5 (Oct. 9, 2024) (requiring detailed data on emissions of pollutants). The Order here instead gestures towards "such additional information" as the Department, in the future, may (or may not) "request[] . . . from time to time." Order at 3. That possibility of future, unspecified inquiry cannot satisfy the statute's demand that the Department "ensure" that its Order minimizes environmental impacts. 16 U.S.C. § 824a(c)(2).

2.   *The Campbell Plant's Pollution and Lack of Maintenance Mean that the Absence of Effective Environmental Conditions Will Have Especially Severe Effects.*

The absence of enforceable conditions—coupled with the inadequate limits on when Campbell can operate—is especially concerning here for two reasons: the significant environmental impacts of coal-fired power generation; and the apparent disrepair of the plant's pollution controls.

Coal-fired power plants like Campbell are a significant source of air and water pollution and waste. *See, e.g.*, *National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units Review of the Residual Risk and Technology Review*, 88 Fed. Reg. 24,854, 24,857 (Apr. 23, 2023) ("[C]oal- and oil-fired [power plants] remain the largest domestic emitter of [mercury] and many other [hazardous air pollutants]."). Air emissions from coal plants can cause serious human health and environmental impacts. *See, e.g.*, *id.*; EPA, *Health and Environmental Effects of Particulate Matter* (PM);[13] EPA, *Effects of NO₂*.[14] Wastewater discharges from coal plants "contain toxic metals such as mercury, arsenic, lead, and selenium, which bioaccumulate in fish, accumulate in lake and reservoir sediment, and pollute drinking water supplies. People who eat the tainted fish or drink the tainted water can suffer negative health consequences such as cancer, cardiovascular disease, neurological disorders, kidney and liver damage, and lowered IQs (in children)." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1007 (5th Cir. 2019). Likewise, coal ash—the waste product that results from burning coal—"contain[s] myriad carcinogens and neurotoxins that contribute to increased rates of 'cancer in the skin, liver, bladder, and lungs,' 'neurological and psychiatric effects,' 'damage to blood vessels,' and 'anemia' in people exposed to them" while also "pos[ing] risks to plant and animal wildlife, including '[e]levated selenium levels in migratory birds, wetland vegetative damage, fish kills, amphibian deformities, . . . [and] plant toxicity.'" *Elec. Energy, Inc. v. Env't Prot.*

---

[13] Available at https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm (last visited June 18, 2025).

[14] Available at https://www.epa.gov/no2-pollution/basic-information-about-no2#Effects (last visited June 18, 2025).

*Agency*, 106 F.4th 31, 35 (D.C. Cir. 2024) (alterations in original) (quoting EPA rulemakings on coal ash). Campbell will produce this environmentally damaging and health-harming pollution if it continues to operate. Ex. 3 at 21 (Powers Decl.).

Moreover, Consumers' filings at the Michigan Commission indicate that the plant may no longer be able to meet certain legal limits on its pollution due to deferred investment and maintenance. The company planned to conduct multiple capital and maintenance projects related to Campbell's air pollution control equipment *if* the plant operated past 2025. *Id.* at 19–20. However, after committing to retire Campbell in May 2025, the company did not undertake many of these projects. *Id.* The following table from Public Interest Organizations' expert engineer shows these cancelled projects. *Id.* at 20.

### Cancelled Capital Projects at Campbell from 2022–2025 for Air Quality Control

| Year | Unit | Project | Budget ($) |
|------|------|---------|-----------|
| 2022 | 2 | • (SCR) catalyst management | 1,120,000 |
|      | 3 | • Fabric filter bag(s) & cleaning air manifold replacement | 3,994,601 |
| 2023 | 1 | • Fabric filter bag replacement | 1,514,100 |
|      | 2 | • SCR reactor catalyst replacement | 2,000,000 |
|      | 3 | • Fabric filter bag(s) & cleaning air manifold replacement | 3,263,331 |
| 2025 | 3 | • SCR reactor catalyst management | 3,000,000 |
|      |   | • Air quality control sys. (AQCS) equip. repair/replacement | 1,000,000 |

The dollar figures shown above are as presented in Ex. 13 at 14–18 (Kapala Direct Testimony).

Without that critical upkeep, Campbell's air pollution controls may no longer work effectively and the plant may no longer be able to meet its air permit limits. *Id.* at 19–20.

Ordering a heavily polluting coal-fired power plant to operate when its pollution controls have fallen into disrepair plainly would not be consistent with the requirement that Section 202(c) orders are, "to the maximum extent practicable," consistent with environmental requirements and that the Department minimize any adverse environmental impact. 16 U.S.C. § 824a(c)(2). Robust reporting requirements and tight limits on Campbell's operations are therefore especially necessary to effectuate the Department's statutory duty. The Department's Order will be responsible for the plant's additional pollution: If Campbell retired on May 31, 2025 as planned, its air emissions, coal ash production, and much of its wastewater discharges would have ceased. But for the Order, that new air and water pollution and waste creation—and the associated environmental impacts— would not occur. This makes it all the more important for the Department to closely track and aggressively mitigate Campbell's adverse environmental impacts. As such, the Department should require verification from Consumers that its air

49

pollution control systems are functioning properly before authorizing Campbell to operate under emergency demand conditions. Ex. 3 at 20 (Powers Decl.). Further, if the units' continuous air pollution monitors detect any exceedance of permit limits during operation, DOE should require the offending unit(s) to shut down. *Id.*

E. *The Order and the Department's Continued Conduct Are Inconsistent with Departmental Procedure, Depriving the Public and the Public Interest Organizations of Fair Notice and an Adequate Record.*

According to the Department's procedures, the agency will use "best efforts" to post filings on a specified website within 24 hours of receipt. DOE Rehearing Procedures (linking to U.S. Dep't of Energy, *DOE's Use of Federal Power Act Emergency Authority* (last visited June 18, 2025), https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority [hereinafter "DOE 202(c) Website"]).

The Department has received, and is supposed to receive, materials related to this proceeding that it has not posted. On June 10, 2025, the Department "received a letter from counsel for Consumers which stated that MISO and Consumers have not been able to reach agreement on the rate issues relating to the May 23, 2025 Order. Ex. 16 (DOE Letter to FERC). Additionally, in the May 23 Order, the Department ordered MISO to "provide a daily notification to the Department (via AskCR@hq.doe.gov) reporting whether the Campbell Plant has operated in compliance with the allowances contained in this Order." Ex. 1 at 3 (DOE Campbell Order). The Department further ordered MISO to provide, by June 15, 2025, "information concerning the measures it has taken and is planning to take to ensure the operational availability and economic dispatch of the Campbell Plant consistent with the public interest." *Id.* Additionally, the Department ordered that "MISO shall also provide such additional information regarding the environmental impacts of this Order and its compliance with the conditions of this Order, in each case as requested by the Department of Energy from time to time." *Id.*

None of those materials are posted on the DOE 202(c) Website. The Department's letter to FERC indicates that it has reviewed the letter it received from Consumers; the letter nevertheless does not appear on the website, and the Department has not indicated there the docket or other locations in which to find Consumers' letter and similar materials.

The Department must follow its own procedures. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *Mine Reclamation Corp. v. FERC*, 30 F.3d 1519, 1524 (D.C. Cir. 1994). The Department's failure to follow its procedures deprives the public and Public Interest Organizations of fair notice and an adequate record. *See United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 249 (2d Cir. 1977).

50

V. Request for Stay

Public Interest Organizations further move the Department for a stay of the Order until the conclusion of judicial review. 18 C.F.R. § 385.212.[15] The Department has the authority to issue such a stay under the Administrative Procedure Act and should do so where "justice so requires." 5 U.S.C. § 705. In deciding whether to grant a request for stay, agencies consider (1) whether the party requesting the stay will suffer irreparable injury without a stay; (2) whether issuing a stay may substantially harm other parties; and (3) whether a stay is in the public interest. *Nken v. Holder*, 556 U.S. 418, 434, 436 (2010); *Ohio v. EPA*, 603 U.S. 279, 291 (2024); *see, e.g.*, *Midcontinent Indep. Sys. Operator, Inc.*, 184 FERC ¶ 61,020, at P 41 (2023); *ISO Eng. Inc.*, 178 FERC ¶ 61,063, at P 13 (2022), *rev'd on other grounds sub nom. In re NTE Conn., LLC*, 26 F.4th 980, 987–88 (D.C. Cir. 2022).

Injuries under this standard must be actual, certain, imminent, and beyond remediation. *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *ANR Pipeline Co.*, 91 FERC ¶ 61,252, at 61,887 (2000); *City of Tacoma*, 89 FERC ¶ 61,273, at 61,795 (1999) (recognizing that, absent a stay, options for "meaningful judicial review would be effectively foreclosed"). Financial injury is only irreparable where no "adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Wis. Gas Co.*, 758 F.2d at 674 (*quoting Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)); *see also In re NTE Conn., LLC*, 26 F.4th 980, 991 (D.C. Cir. 2022). Environmental injury, however, "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

Under those standards, a stay of the Order is appropriate.

A. *Intervenors Are Irreparably Harmed by the Order.*

A stay is necessary to ensure that Consumers does not continue with activities that are already causing irreparable harm to Public Interest Organizations, their members, and the public as a result of the Department's Order. *See Consumers Energy v. Midwestern Independent Sys. Operator, Inc.*, Complaint Requesting Fast Track Processing, FERC Docket No. EL25-90, 2 (June 6, 2025), Accession No. 20250606-5231 ("[T]he Campbell Plant is currently being offered into the MISO

---

[15] Pursuant to FPA Section 313 and Rule 713(e) of the applicable rules, the filing of a request for rehearing does not automatically stay a Department Order. 16 U.S.C. § 825*l*, 18 C.F.R. § 385.713(e).

market and is producing energy when dispatched."). As noted extensively above in Section III.A.1, during its time of operation, Michiganders' health and environment have been profoundly and irreparably harmed by pollution from the Campbell Plant. Along with the highest emissions of sulfur dioxide, carbon dioxide, and volatile organic compounds of any plant in Consumers' generation fleet, it was also a major source of water pollution in its area. Ex. 23 at 11 (Bilsback Direct Testimony); EPA, ECHO, https://echo.epa.gov/detailed-facility-report?fid=110000411108 (last visited June 18, 2025). Campbell's closure is set to eliminate 538 tons of particulate matter, 13 tons of volatile organic compounds, 2,918 tons of nitrogen oxides, 5,244 tons of sulfur dioxide, and 8.2 megatons of carbon dioxide emissions per year based on 2019 operational levels. Ex. 23 at 11. This translates to ending 36–81 premature deaths and $389–$879 million in health impact costs *every year*. *Id.* at 15. These harms, which flow directly from the Department's Order, are actual, specific, imminent, and deadly. They will affect the lives and well-being of Public Interest Organizations and their members. The stark public health stakes of Public Interest Organizations' request for stay require the Department to pause implementation of its Order until a Court reviews its validity.

Moreover, the economic impacts of complying with this Order will be steep. This planned retirement represented major cost savings for ratepayers stemming directly from the closure of the unreliable and highly expensive Campbell plant. *See, e.g.*, Ex. 53 (Consumers News Release). Without a stay, the Department will needlessly force Consumers to divert attention and investment dollars away from compliance with the 2022 Settlement, thereby exceeding its jurisdiction and denying Public Interest Organizations' members the benefits of Michigan energy policies they and the public are designed to benefit from. 16 U.S.C. § 824; *see also Hughes*, 578 U.S. at 154 ("Under the FPA, FERC has exclusive authority to regulate 'the sale of electric energy at wholesale in interstate commerce' . . . 'But the law places beyond FERC's power, and leaves to the States alone, the regulation of "any other sale"—most notably, any retail sale—of electricity.'") (*quoting* 16 U.S.C. § 824(b)(1) *and Elec. Power Supply Ass'n*, 577 U.S. at 265). The states' reserved authority includes control over in-state "facilities used for the generation of electric energy." 16 U.S.C. §824(b)(1); *see Pac. Gas & Elec.*, 461 U. S. at 205 ("Need for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States."). In forcing ratepayers to reopen and operate an uneconomic, unreliable, and obsolete resource that the state, stakeholders, and owner want to close, *see supra* sections III.A.1, III.C.1, the Department's Order jeopardizes the diversification of generating resources the Department itself has said increases grid reliability and will inherently and unjustifiably add to ratepayer costs. DOE, *Energy Reliability and Resilience,* https://www.energy.gov/eere/energy-reliability-and-resilience (last visited June 18, 2025). As there is no clear recourse to recovering these costs from the Department should Public Interest Organizations prevail in their challenge, a stay pending judicial review is necessary to protect ratepayers from unwarranted energy costs increases—especially at a time when energy prices are already on the rise. *See, e.g.,*

Stan Huxley, *Average Cost of Utilities in Michigan* (June 1, 2025),
https://realestates.network/data-research/average-cost-of-utilities-in-michigan; Kyle
Davidson, Michigan Advance, *Detroit Households Face High Energy Costs, Study
Says* (Sept. 16, 2024), https://michiganadvance.com/2024/09/16/detroit-households-
face-high-energy-costs-study-says.

Estimates of cost savings from the plant closure are substantial. *See, e.g.*, *supra*
section III.A.1; Ex. 53 (Consumers News Release) (describing total cost savings from
2022 updates to Consumers Clean Energy Plan, including Campbell's closure).
These are savings that are already being reinvested in newer, more reliable
facilities. Because of the age of the Campbell Plant and the unreasonably short
notice and lack of warning around the Order's issuance, the facility has had to
scramble not just to try and procure coal, but to hire new operators and perform
highly expensive maintenance necessary to operate the units. *See, e.g., supra*
section IV.B.2. Consumers reports to FERC that it is taking steps in response to the
Order, and it has also filed for cost recovery with FERC. *Consumers Energy v.
Midwestern Indep. Sys. Operator, Inc.*, Complaint Requesting Fast Track
Processing, FERC Docket No. EL25-90, (June 6, 2025), Accession No. 20250606-
5231. If Consumers' filing is granted, costs will be borne by Michigan and MISO
ratepayers, and the Department does not identify any clear recourse for a refund in
the event the Order is declared unlawful.

## B.  A Stay Would Not Result in Harm to Any Other Interested Parties.

No other interested parties would be harmed by a stay. The issuance of a stay
would not harm end-use electricity consumers because the lack of an actual
emergency means that a stay would not disrupt the provision of electricity. *See
supra* sections III.B–C, IV.A. Furthermore, because Consumers and MISO have
both already planned for the closure of the Campbell Plant, a stay would only have
the effect of relieving them of the administrative, compliance, and planning burdens
imposed by the Order. *See, e.g.*, Ex. 1 at 2–3 (DOE Campbell Order). On the
balancing of equities, there is therefore no meaningful countervailing harm that
would follow from a stay.

## C.  A Stay is in the Public Interest Given the Significant Evidence Demonstrating There is No Factual or Legal Support for This Order, and the Harm it Produces to the Broader Public.

There is no public interest served by the Order, and a stay will only benefit the
public. First, the Order exceeds the Department's authority; it has provided no
reasonable grounds to substantiate any near-term or imminent shortfall in
electricity supply that would justify Campbell's continued operation. *See League of
Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (noting "there is a
substantial public interest 'in having governmental agencies abide by the federal

53

laws that govern their existence and operations'") (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Second, the Order overrides Michigan's exercise of its "authority to choose [its] preferred mix of energy generation resources." *Citizens Action*, 125 F.4th at 239. And third, it would protect the broader public—beyond Public Interest Organizations and their members—from the onerous costs, and dangerous pollution, produced by unnecessary operation of the Campbell Plant.

## VI. CONCLUSION

For the reasons set forth above, the undersigned Public Interest Organizations respectfully request that the Department grant intervention; grant rehearing and rescind the Order (and any renewals of the Order); and stay the Order.

Filed on June 18, 2025

Submitted by:

/s/ *Michael Lenoff*
Michael Lenoff, Senior Attorney
Shannon Fisk, Director, State Electric
Sector Advocacy
Michael Soules, Senior Attorney
Lauren Piette, Senior Attorney
Sameer Doshi, Senior Attorney
Christine Powell, Deputy Managing
Attorney
Alexander Tom, Senior Associate
Attorney
Ada Statler, Senior Associate
Earthjustice
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
mlenoff@earthjustice.org
sfisk@earthjustice.org
msoules@earthjustice.org
lpiette@earthjustice.org
sdoshi@earthjustice.org
cpowell@earthjustice.org
atom@earthjustice.org
astatler@earthjustice.org
(312) 500-2193

*Counsel for Sierra Club and Urban
Core Collective*

/s/ *Gregory E. Wannier*
Gregory E. Wannier
Sanjay Narayan
Elena Saxonhouse
Sierra Club Environmental Law
Program
2101 Webster St., Ste 1300
Oakland, CA 94612
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
elena.saxonhouse@sierraclub.org
(415) 977-5646

/s/ *Caroline Reiser*
Caroline Reiser
Natural Resources Defense Council
1152 15th St., NW, Suite 300
Washington, DC 20005
creiser@nrdc.org
(202) 717-8341

Gavin McCabe
Natural Resources Defense Council
40 W 20th St #11th
New York, NY 10011
gmccabe@nrdc.org
(212) 727-4529

Charlotte Jameson
Chief Policy Officer
Michigan Environmental Council
602 W Ionia St.
Lansing, MI 48933
charlotte@environmentalcouncil.org
(517) 487-9539

/s/ Danielle Fidler
Danielle Fidler
Francis W. Sturges, Jr.
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
dfidler@catf.us
fsturges@catf.us
(617) 624-0234

Counsel for Michigan Environmental
Council

/s/ Alexis S. Blizman
Alexis S. Blizman
Policy Director
Ecology Center
339 E. Liberty, Suite 300
Ann Arbor, MI 48104
alexis@ecocenter.org
(734) 369-9281

/s/ Ted Kelly
Ted Kelly
Tomás Carbonell
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
tekelly@edf.org
tcarbonell@edf.org
(202) 387-3500

/s/ Bradley Klein
Bradley Klein
Managing Attorney
Environmental Law & Policy Center
35 E. Wacker Dr., Suite 1600
Chicago, IL 60601
bklein@elpc.org
(312) 420-5503

/s/ Tyson Slocum
Tyson Slocum
Energy Program Director
Public Citizen, Inc.
215 Pennsylvania Ave SE
Washington, DC 20003
tslocum@citizen.org
(202) 454-5191

/s/ James Gignac
James Gignac
Associate Director, Midwest Policy
Union of Concerned Scientists
200 E. Randolph St., Suite 5100
Chicago, IL 60601
jgignac@ucs.org
(773) 941-7916

Sergio Cira-Reyes
Climate Justice Catalyst
Urban Core Collective
sergio@uccgr.org

/s/ William Kenworthy
William Kenworthy
Senior Regulatory Director, Midwest
Vote Solar
1 South Dearborn St., Suite 2000
Chicago, IL 60603
will@votesolar.org
(704) 241-4394

Attachment: Index of Exhibits

**Index of Exhibits**

| Exhibit No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1 | DOE Campbell Order | DOE Order No. 202-25-3 (May 23, 2025) | https://www.energy.gov/sites/default/files/2025-05/Midcontinent%20Independent%20System%20Operator%20%28MISO%29%202%0202%28c%29%20Order_1.pdf |
| 2 | Grid Strategies Report | Michael Goggin, *A Review of DOE's 202(c) Order for the Campbell Coal Plant* (June 18, 2025) | |
| 3 | Powers Decl. | Declaration of Bill Powers, P.E. (June 15, 2025) (including attachments) | |
| 4 | DOE Campbell Memorandum | DOE, Decision Order Pursuant to Section 202(c) of the Federal Power Act for J.H. Campbell Power Plant (May 23, 2025) | https://www.documentcloud.org/documents/25956475-cuiprivileged-department-of-energy-memorandum-re-jh-campbell-coal-plant-in-michigan-section-202c-federal-power-act-order-may-2025/ |
| 5 | DOE Order No. 202-22-4 | DOE, Order No. 202-22-4 (Dec. 24, 2022) | https://www.energy.gov/sites/default/files/2022-12/PJM%20202%28c%29%20Order.pdf |
| 6 | DOE Order No. 202-17-4 Summary of Findings | Summary of Findings DOE Order No. 202-17-4 (Sep. 14, 2017) | https://www.energy.gov/sites/default/files/2017/09/f36/Order%20202-17-4%20Summary%20of%20Findings.pdf |
| 7 | DOE Order No. 202-02-1 | DOE, Order No. 202-02-1 (Aug. 16, 2002) | https://www.energy.gov/sites/default/files/202%28c%29%20order%20202-02-1%20August%2016%2C%202002%20-%20CSC.pdf |
| 8 | Cooke Email to Alle-Murphy | Email from Lot Cooke, DOE to Linda Alle-Murphy Re: Rehearing procedures for DOE Order No. 202-05-3 | https://www.energy.gov/oe/articles/question-and-answer-procedural-questions-application-rehearing-order-no-202-05-02?nrg_redirect=397676 |

| Exhibit No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 9 | Order Approving Campbell Settlement Agreement and Settlement Agreement | MPSC Case No. U-21090, Order Approving Settlement Agreement (June 23, 2022) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000003KjSDAA0 |
| 10 | Blumenstock 2023 Direct Testimony | MPSC Case No. U-21389, Direct Testimony & Exhibits of Richard T. Blumenstock on Behalf of Consumers Energy Company (May 2023) (excerpted from larger transcript) | **Testimony**: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y00000ACpRQAA1<br><br>**Exhibits**: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y00000ACV7bAAH |
| 11 | Blumenstock 2024 Direct Testimony | MPSC Case No. U-21585, Direct Testimony & Exhibits of Richard T. Blumenstock on Behalf of Consumers Energy Company (May 2024) (excerpted from larger transcript) | **Testimony**: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000KfWrgAAF<br><br>**Exhibits**: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000KLJlzAAH |
| 12 | Blumenstock 2025 Direct Testimony | MPSC Case No. U-21870, Direct Testimony & Exhibits of Richard T. Blumenstock on Behalf of Consumers Energy Company (June 2025) (excerpted from larger filing) | **Testimony**: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000s6UQyAAM<br><br>**Exhibits**: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000s7CdKAAU |

| Exhibit No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 13 | Kapala Direct Testimony | MPSC Case No. U-21090, Revised Direct Testimony of Norman J. Kapala on Behalf of Consumers Energy Company (Oct. 2021) (excerpted from larger transcript) | **Testimony**: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000001QqldAAC <br><br> **Exhibits**: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000001OZHpAAO |
| 14 | Hoffman 2024 Direct Testimony | MPSC Case No. U-21258, Direct Testimony and Exhibits of Nathan J. Hoffman on Behalf of Consumers Energy Company (Mar. 2024) (excerpted from larger transcript) | **Testimony**: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000ljeStAAI <br><br> **Exhibits**: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000g8QemAAE |
| 15 | Hoffman 2025 Direct Testimony | MPSC Case No. U-21424, Direct Testimony & Exhibits of Nathan J. Hoffman on Behalf of Consumers Energy Company (Mar. 2025) (excerpted from larger filing) | **Testimony and exhibits**: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000hjHqNAAU |
| 16 | DOE Letter to FERC | Holly Rachel Smith, Deputy Gen. Counsel, U.S. Dep't of Energy to Debbie-Anne A. Reese, Secretary, FERC (dated June 13, 2025, filed June 16, 2025) | https://elibrary.ferc.gov/eLibrary/filelist?accession_num=20250616-4000 |

| Exhibit No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 17 | DOE Order No. 202-20-2 | Department of Energy Order No. 202-20-2 (Sept. 6. 2020) | https://www.energy.gov/oe/articles/federal-power-act-section-202c-caiso-september-2020?nrg_redirect=454296 |
| 18 | Proudfoot Rebuttal Testimony | MPSC Case No. U-21090, Rebuttal Testimony of Paul Proudfoot in Support of the Settlement Agreement on behalf of MPSC Staff (May 13, 2022) (excerpted from larger transcript) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000002z5EqAAI |
| 19 | Walz Direct Testimony | MPSC Case No. U-21090, Revised Direct Testimony & Exhibits of Sara T. Walz on Behalf of Consumers Energy Company (June 2021) (excerpted from larger transcript) | **Testimony**: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000001OEXnAAO<br><br>**Exhibits**: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068t000000NibWaAAJ |
| 20 | King Direct Testimony | MPSC Case No. U-21090, Direct Testimony & Exhibits of Thomas King Jr. on Behalf of Wolverine Power Supply Cooperative, Inc. (2021) (excerpted from larger transcript) | **Testimony**: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000002paWpAAI<br><br>**Exhibits**: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068t000000Vibb0AAB |

| Exhibit No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 21 | Bleckman Direct Testimony | MPSC Case No. U-21816, Direct Testimony of Marc R. Bleckman on Behalf of Consumers Energy Company (Nov. 2024) (excerpted from larger transcript) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000nPekYAAS |
| 22 | Hahn Direct Testimony | MPSC Case No. U-21592, Direct Testimony of Joshua W. Hahn on Behalf of Consumers Energy Company (Sept. 2024) (excerpted from larger transcript) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000CFqsPAAT |
| 23 | Bilsback Direct Testimony | MPSC Case No. U-21090, Direct Testimony of Kelsey Bilsback on Behalf of ELPC, Ecology Center, UCS, and Vote Solar (Oct. 2021) (excerpted from larger transcript) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000002paWpAAI |
| 24 | Mic. Pub. Power Agency Petition to Intervene | MPSC Case No. U-21090, Michigan Public Power Agency's Petition to Intervene (July 19, 2021) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068t000000Qf5I7AAJ |

| Exhibit No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 25 | 2026 Consumers Energy Capacity Demonstration | MPSC Case No. U-21225, Consumers Energy Company's Capacity Demonstration for Planning Year 2026 (Dec. 21, 2022) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000005iOnPAAU |
| 26 | 2027/2028 Consumers Energy Capacity Demonstration | MPSC Case No. U-21393, Consumers Energy Company's Capacity Demonstration for Planning Year 2027/2028 (Feb. 22, 2022) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y00000C8NDHAA3 |
| 27 | 2028/2029 Consumers Capacity Demonstration | MPSC Case No. U-21775, Consumers Energy Company's Capacity Demonstration for Planning Year 2028/2029 (Feb. 24, 2025) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000bz8crAAA |
| 28 | 2028/2029 MPSC Staff Capacity Demonstration Results | MPSC Case No. U-21775, Michigan Public Service Commission Staff, Capacity Demonstration Results: Planning Year 2028/29 (May 12, 2025) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000ocKc4AAE |

| Exhibit No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 29 | 2024 Consumers ELG Annual Report | Consumers Energy, Notice of Planned Participation; Annual Progress Report Pursuant to 40 C.F.R. 423.19(g)(3); Consumers Energy Company, JH Campbell Complex NPDES Permit No. MI0001422, Steam Electric Effluent Limitations Guidelines (Dec. 16, 2024) | https://www.consumersenergy.com/-/media/CE/Documents/sustainability/coal-combustion-residuals/jhc/2024/2024-seeg-jhc-nopp-annual-progress%20Report_FINAL.pdf |
| 30 | DOE Rehearing Procedures | U.S. Dep't of Energy, DOE 202(c) Order Rehearing Procedures (last visited June 17, 2025) | https://www.energy.gov/ceser/doe-202c-order-rehearing-procedures |
| 31 | MISO 2025–26 Auction Results | MISO, Planning Resource Auction, Results for Planning Year 2025-2026 (Apr. 2025) | https://cdn.misoenergy.org/2025%20PRA%20Results%20Posting%2020250529_Corrections694160.pdf |
| 32 | MISO Emergency Declarations | MISO, Maximum Generation Emergency Declarations through June 2024 (Aug. 30, 2024) | https://www.oasis.oati.com/woa/docs/MISO/MISOdocs/Capacity_Emergency_Historical_Information.pdf |
| 33 | MISO Market Capacity Emergency | MISO, Market Capacity Emergency, SO-P-EOP-11-002 Rev: 21 (Mar. 3, 2025) | https://cdn.misoenergy.org/SO-P-EOP-11-002%20Rev%2021%20MISO%20Market%20Capacity%20Emergency683501.pdf |

| Exhibit No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 34 | Ramey MISO Comments | Comments of Todd Ramey on Behalf of Midcontinent ISO, Inc. (May 28, 2025), Docket No. AD24-11-000, Accession No. 20250528-4032 | https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250528-4032&optimized=false&sid=4f4f3475-8309-4416-8289-2aee6d84c1a8 |
| 35 | Patton MISO Comments | Technical Conference Comments of David B. Patton, Ph.D., MISO Independent Market Monitor (May 28, 2025), Docket No. AD25-7-000, Accession No. 20250528-4006 | https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250528-4006&optimized=false&sid=2c5ac909-a7f0-47eb-9bb3-c35f89976250 |
| 36 | MISO Elliott Max. Gen. Event Overview | MISO, Overview of Winter Storm Elliott December 23, Maximum Generation Event (Jan. 17, 2023) | https://cdn.misoenergy.org/20230117%20RSC%20Item%2005%20Winter%20Storm%20Elliott%20Preliminary%20Report627535.pdf |
| 37 | MISO 2025-2026 CIL/CEL Final Results | MISO, 2025-2026 PY Seasonal CIL/CEL Final Results (Oct. 24, 2024) | https://cdn.misoenergy.org/20241024%20LOLEWG%20Item%2004%20PY%202025-2026%20Final%20CIL_CEL%20Results654989.pdf |
| 38 | MISO LOLE Presentation | MISO, *LOLE 101: Probabilistic Analyses* | https://cdn.misoenergy.org/LOLE%20101%20Training624875.pdf |
| 39 | DOE Order No. 202-22-2 | Department of Energy Order No. 202-22-2 (Sept. 4, 2022) | https://www.energy.gov/ceser/federal-power-act-section-202c-banc-september-2022 |
| 40 | NERC 2024 Reliability Report | NERC, 2024 State of Reliability (June 2024) (excerpt) | https://www.nerc.com/pa/RAPA/PA/Performance%20Analysis%20DL/NERC_SOR_2024_Technical_Assessment.pdf |
| 41 | NERC 2025 Summer Reliability Assessment | NERC, 2025 Summer Reliability Assessment (May 2025) | https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2025.pdf |

| Exhibit No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 42 | 2019–24 NERC Summer Reliability Assessments | NERC, Summer Reliability Assessments for 2019-2024 (Compiled) | 2019 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2019.pdf<br><br>2020 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2020.pdf<br><br>2021 Reliability Assessment: https://nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC%20SRA%202021.pdf<br><br>2022 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2022.pdf<br><br>2023 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2023.pdf<br><br>2024 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2024.pdf |
| 43 | Winter Storm Elliott System Operations Inquiry | FERC, NERC, and Regional Entity Staff Report, *Inquiry into Bulk-Power System Operations During December 2022 Winter Storm Elliott* (Oct. 2023) | https://www.ferc.gov/media/winter-storm-elliott-report-inquiry-bulk-power-system-operations-during-december-2022# |

| Exhibit No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 44 | PJM Elliott Report | PJM, *Winter Storm Elliott: Event Analysis and Recommendation Report* (July 17, 2023) | https://www.pjm.com/-/media/DotCom/library/reports-notices/special-reports/2023/20230717-winter-storm-elliott-event-analysis-and-recommendation-report.pdf?ref=blog.gridstatus.io |
| 45 | DOE Order No. 202-21-1 | Department of Energy Order No. 202-21-1 (Feb. 14, 2021) | https://www.energy.gov/oe/articles/federal-power-act-section-202c-ercot-february-2021?nrg_redirect=364318 |
| 46 | FERC Energy Primer | FERC, Energy Primer: A Handbook of Energy Market Basics (Dec. 2023) (excerpt) | https://www.ferc.gov/media/energy-primer-handbook-energy-market-basics |
| 47 | 2024 Coal Ash Inspection Report | J.H. Campbell Generating Facility 2024 Facility Inspection Report (Oct. 2024) | https://www.consumersenergy.com/-/media/CE/Documents/sustainability/coal-combustion-residuals/jhc/2024/2024_JH-Campbell_Dry-Ash-Landfill_Inspection-Report_10-06-24.pdf |
| 48 | 2021 CWA Permit | J.H. Campbell National Pollutant Discharge Elimination System Permit No. MI000142 (Oct. 2021) | https://mienviro.michigan.gov/nsite/map/results/detail/6241586858212305105/documents (type "Notice of NPDES permit issuance" within the "file" field, which should automatically filter results to one file dated 10/21/2021 and titled "CECO-J H Campbell Power Plt -- Notice NPDES permit issuance -- Major modification.pdf"; click the file name to download) |
| 49 | 2025 Energy Innovation Dataset | Energy Innovation, dataset for Coal Power 28 Percent More Expensive In 2024 Than In 2021 (June 5, 2025) | https://energyinnovation.org/report/coal-power-28-percent-more-expensive-in-2024-than-in-2021/ |

| Exhibit No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 50 | 2025 Energy Innovation Coal Cost Report | Energy Innovation, Coal Power 28 Percent More Expensive In 2024 Than In 2021 (June 5, 2025) | https://energyinnovation.org/wp-content/uploads/Coal-Cost-Update.pdf |
| 51 | 2023 Energy Innovation Coal Cost Report | Energy Innovation, Coal Cost Crossover 3.0 (Jan. 2023) | https://energyinnovation.org/wp-content/uploads/Coal-Cost-Crossover-3.0-2.pdf |
| 52 | MI State Energy Profile | U.S. EIA, Michigan State Energy Profile (Oct. 17, 2024) | https://www.eia.gov/state/print.php?sid=mi |
| 53 | Consumers News Release | Consumers Energy, *Landmark Plan to Accelerate End of Coal Era, Provide Reliability and Protect Environment Earns Approval* (June 23, 2022) | https://www.consumersenergy.com/news-releases/news-release-details/2022/06/23/20/43/plan-to-accelerate-end-of-coal-era-provide-reliability-and-protect-environment-earns-approval |
| 54 | NARUC Coal Report | National Association of Regulatory Utility Commissioners, Recent Changes to U.S. Coal Plant Operations and Current Compensation Practices (Jan. 2020) (excerpt) | https://www.osti.gov/servlets/purl/1869928 |
| 55 | IEA Flexibility Report | C. Henderson, International Energy Agency, Increasing the flexibility of coal-fired power plants (Sept. 2014) (excerpt) | https://usea.org/sites/default/files/092014_Increasing%20the%20flexibility%20of%20coal-fired%20power%20plants_ccc242.pdf |

11

| Exhibit No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 56 | Blumenstock 2021 Second Rebuttal Testimony | MPSC Filing No. U-21090, Second Rebuttal Testimony of Richard T. Blumenstock on Behalf of Consumers Energy Company (May 9, 2022) (excerpted from larger transcript) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000002z5EqAAI |
| 57 | Jester 2021 Direct Testimony | MPSC Filing No. U-21090, Testimony of Douglas B. Jester in Support of Settlement Agreement on Behalf of the Michigan Environmental Council, Natural Resources Defense Council, Sierra Club, and Citizens Utility Board of Michigan (May 9, 2022) (excerpted from larger transcript) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000002z5EqAAI |
| 58 | MISO Tariff Module E-1 | MISO Tariff Module E-1 – Resource Adequacy | https://docs.misoenergy.org/miso12-legalcontent/Module_E-1_-_Resource_Adequacy.pdf |
| 59 | MISO 2025–2026 Prelim. PRA Report with Final Results | MISO PY 2025-2026 Seasonal Preliminary PRA Report with Final Results (June 16, 2025) | https://cdn.misoenergy.org/PY 2025_2026 Seasonal Preliminary PRA Report 03_18_25686471.xlsxhttps://cdn.misoenergy.org/PY%202025_2026%20Seasonal%20Preliminary%20PRA%20Report%20with%20Final%20Results%2006_15_25703532.xlsx |

| Exhibit No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 60 | MISO Tariff Section 38.2.7 | MISO Tariff Section 38.2.7 | https://docs.misoenergy.org/miso12-legalcontent/TariffAsFiledVersion.pdf |
| 61 | MISO Tariff Attachment Y | MISO Tariff Attachment Y | https://docs.misoenergy.org/miso12-legalcontent/Attachment_Y_-_Notification_of_Potential_Resource_-_SCU_Change_of_Status.pdf |
| 62 | FERC Technical Conference Notice | FERC, *Meeting the Challenge of Resource Adequacy in Regional Transmission Organization and Independent System Operator Regions* (June 2, 2025) | https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250602-3068&optimized=false&sid=457eb824-f5ed-41fa-a043-a0cd8c55cb4b |
| 63 | Palgrave Handbook | M. Hafner & G. Luciana, Palgrave Handbook of International Economics (2022) (excerpt) | https://link.springer.com/book/10.1007/978-3-030-86884-0 |
| 64 | IEA Report | International Energy Agency, The role of CCUS in low-carbon power systems (2020) (excerpt) | https://www.iea.org/reports/the-role-of-ccus-in-low-carbon-power-systems |
| 65 | DOE Transmission Planning Study | DOE, Nat'l Transmission Planning Study, Ch. 2: Long-Term U.S. Transmission Planning Scenarios (2024) | https://www.energy.gov/sites/default/files/2024-10/NationalTransmissionPlanningStudy-Chapter2.pdf |

| Exhibit No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 66 | NERC 2024 Interregional Transfer Capability Study, Part 1 | NERC, Interregional Transfer Capability Study: (ITCS) Strengthening Reliability Through the Energy Transformation, Transfer Capability Analysis (Part 1) (Aug. 2024) | https://www.nerc.com/pa/RAPA/Documents/ITCS_Part_1_Results.pdf |